UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL ZAVATSON,

                Plaintiff,

                          Case No. 14-10623

vs.                           Paul D. Borman
                           United States District Judge

CITY OF WARREN, ET AL.,

                Defendants.
_____/

OPINION AND ORDER:
(1) GRANTING DEFENDANTS SEIDL AND CITY OF WARREN'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 43) AND
(2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANT SEIDL (ECF NO. 61)

Plaintiff filed this action on February 10, 2014 setting forth federal and state claims arising from his arrest after money was reported stolen in November 2012 from two offices in Fitzgerald High School.  (ECF No. 1.)  Plaintiff, a custodian at the high school, was the subject of an investigation by both the police and his employer, Fitzgerald Public Schools, regarding the thefts.  The school investigation was inconclusive and he was ordered to return to his job.  However, before he could return to work, an arrest warrant for two counts of larceny was issued for Plaintiff.  Ultimately, Plaintiff was bound over on one count of larceny, but that charge was later dismissed following a motion to quash.  Plaintiff was eventually terminated from his position as custodian for allegedly failing to report his felony arraignment as required by Michigan state law.

Plaintiff now moves for partial summary judgment against Defendants Donald Seidl, Marc Sonnenfeld, and John Candela.  (ECF No. 61.)  Defendants Seidl and City of Warren have also moved for Summary Judgment (the "Warren Defendants").  (ECF No. 43.)  Finally, Defendants John Candela, Fitzgerald Public Schools, Fitzgerald Public School Board of Education, Wendy Hagerty,[1] Melanie Rainwater, Marc Sonnenfeld, and Barbara VanSweden (the "Fitzgerald Defendants") have also filed a Motion for Summary Judgment.  (ECF No. 46.)

On February 25, 2016, the Court heard oral argument regarding the Warren Defendants' motion for summary judgment and Plaintiff's motion for partial summary judgment only as to Defendant Seidl.  The Court will address the remaining motions for summary judgment between Plaintiff and the Fitzgerald Defendants separately.

For the following reasons the Court will grant Defendant Seidl and the City of Warren's Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment to the extent it relates to Defendant Seidl.

## I. BACKGROUND

Plaintiff was employed as a custodian for Fitzgerald Public Schools for more than fifteen years.  (Compl. ¶ 21.)  Plaintiff had an impeccable employment record and his personnel file included many accolades for his work ethic.  (ECF No. 62, Pl.'s Resp. to

---

[1] The Complaint in this action erroneously refers to Wendy Hagerty's name as "Haggerty."  It is clear from the exhibits in this action, including memorandum she prepared herself, that her name is properly spelled "Hagerty."  Accordingly, the Court uses the proper spelling.

Siedl/Warren's MSJ, Ex. V, Pl.'s Personnel File.)

A.      Alleged Thefts

On November 27, 2012, Defendant Marc Sonnenfeld, Athletic Director and Dean of Discipline for Fitzgerald High School, filed a police report with the Warren Police Officer John Dahlin and reported that approximately $510.00 was stolen from his office over the recent Thanksgiving holiday break.[2]  (Compl. ¶ 22; ECF No. 43, Defs.' MSJ, Ex. B, Sonnenfeld Dep. Vol. II, at 22; Ex. E, Police Report at 7.)[3]

As the Athletic Director, Defendant Sonnenfeld was responsible for collecting money from sporting events, commonly known as "gate receipts."  (Sonnenfeld Dep. Vol. I., at 34-36.)  This money was kept in his office safe and would be periodically deposited. (*Id*. at 37-38, 45-48, 54-55.)  Defendant Sonnenfeld also kept money in his safe for making the cash drawers able to provide change for future school events and for this reason he always kept $350 in the cash box in his safe.  (*Id*. at 37, 41.)  Defendant Sonnenfeld was responsible for logging the amount of money earned at the sporting events and comparing the money collected to the tickets sold.  (*Id*. at 40, 45.)  However, Defendant Sonnenfeld did not keep receipts or any contemporaneous documents of the

[2] There appears to be some confusion over whether the amount stolen from the safe was $510 or $580.  Defendant Sonnenfeld ultimately testified that the amount in the safe, after his November 5, 2012 deposit, was $510 and that was the amount that was stolen.  (Defs.' MSJ, Ex. B, Sonnenfeld Dep. Vol. II, at 22, *cf*. Sonnenfeld Dep. Vol. I, at 84).

[3] Because of the voluminous record, unless otherwise noted, the exhibits referred to are attached to Defendants Seidl and City of Warren's Motion for Summary Judgment.  When a different exhibit is referred to, the docket number, the name of the motion or response it is attached to, as well as note the exhibit number, will be specified.

amount of money that was kept in the cash boxes for future sporting events.  (Sonnenfeld Dep. Vol. II., at 22-23.)

On November 5, 2012, Defendant Sonnenfeld made a deposit but kept approximately $510.00 in the box; $350.00 for funding a future a cash box and also a number of smaller bills in anticipation of making change for larger bills.  (Sonnenfeld Dep. Vol. I., at 87-88; Sonnenfeld Dep., Vol. II, at 22-23.)  Defendant Sonnenfeld did not keep any documentation to support this fact, but testified that this was the amount of money he retained after making his deposit on November 5, 2012.  (Sonnenfeld Dep., Vol. II, at 23, 45, 64.)  Defendant Sonnenfeld had most recently opened the safe on the Monday prior to November 20, 2012. (Sonnenfeld Dep. Vol. I, at 92-94.)

The safe in Defendant Sonnenfeld's office required a key and a combination to open. (Sonnenfeld Dep., Vol. I, at 55-56.)  Only Defendant Sonnenfeld and his secretary had keys and knew the combination to the safe, but Defendant Sonnenfeld kept his key in a desk drawer, and the combination to the safe was written down on a piece of paper kept in a different drawer concealed under a tray in his office.  (*Id*. at 59-60, 70.)  On November 27, 2012, Defendant Sonnenfeld requested that his secretary bring in her key to the safe because he could not locate his key. (Sonnenfeld Dep. Vol. II, at 44.)  Upon opening the safe, Defendant Sonnenfeld found the cash box was empty and rolls of quarters were missing.  (*Id*.)

When Defendant Sonnenfeld discovered his cash box was empty he went across the hall to Defendant Candela's office (also known as the accounting or business office)

4

to request money for the next sporting event.  (Ex. C., Candela Dep., at 39-40.)

Defendant Candela, as the district accountant, maintained $500.00 in petty cash in a

strong box kept in a safe in room separate but connected to the business office.  (*Id*. at 7,

17-18, 25-26.)  Only Defendant Candela and his secretary had keys to the strong box and

keys to the safe.  (*Id*. at 18-19.)  Similar to Defendant Sonnenfeld, Defendant Candela

kept both of his keys in different unlocked cabinet drawers in his office.  (*Id*. at 22-23,

24.)  Defendant Candela kept his key to the strong box in an unlocked wooden cabinet in

his office, and the key to his safe was kept on a key ring with 50 other keys, concealed, in

a different unlocked cabinet in his office.  (*Id*.)

In response to Defendant Sonnenfeld's need for money for his cash box,

Defendant Candela opened his safe for the first time since June 2012 and discovered that

approximately $260.00 was missing from the box.  In addition to the money being

missing from the strong box, Defendant Candela found no receipts in the box to evidence

who took the money or for what purpose it was taken as were customarily kept to

document expenditures.  (*Id*. at 29-32.)  Upon discovering the money missing from his

office, Defendant Candela immediately notified his boss, the CFO of the district.  (*Id*.)

Later, in January 2013, Defendant Candela was also notified that an employee's credit

card was compromised and he discovered that a photocopy of that card was kept in the

petty cash box in the safe.  (*Id*. at 41-42.)  However, the photocopy of the credit card was

still in the petty cash box when Defendant Candela went back to check in January 2013.

(*Id*. at 42-43.)

5

Upon discovering the missing money from the Athletic Office, and apparently after seeking substitute funds from Defendant Candela, Defendant Sonnenfeld reported the alleged theft to Warren Police on November 27, 2012.  (Sonnenfeld Dep., Vol. II, at 26.)  Gary Skop, a security employee at the school, was directed by either Defendant Sonnenfeld or Carl Schultz, principal of Fitzgerald High School, to review video surveillance of the time period prior to the Thanksgiving break.[4]  (Ex. D, Skop Dep. at 17-19.)  Neither Defendant Sonnenfeld nor Schultz told Skop what to look for in his review or a specific date on which they thought a theft occurred. Skop reviewed surveillance footage starting on November 19, 2012 and went through November 21, 2012, the date that Thanksgiving break began.  (*Id.* at 22-23.)  Skop admitted that the building could still be accessed during the break but he did not review footage from that time period.  (*Id.* at 23-24.)

In reviewing the video footage from the security cameras in the second floor A-Hall, Skop discovered footage of a figure walking down the A-Hall and entering Defendant Sonnenfeld's office at 10:27 p.m. and exiting the office at 10:34 p.m on November 20, 2012.  (Skop Dep. at 34-35.)  Skop also saw video footage in that time period of a shadow or shadowy figure leave the custodian break room and enter the cafeteria.  (Skop Dep. at 49-51; Ex. L, Preliminary Exam., at 63-64.)  Skop was unable to track the figure upon entry to the cafeteria because it was too dark and the camera did not

---

[4] Carl Schultz was a named defendant in this action but was dismissed pursuant to a stipulated order on October 8, 2015.  (ECF No. 49).

6

register any movement.  (Skop Dep. at 49-50, Preliminary Exam., at 64-65.)  Skop did not

recall ever telling anyone from the City of Warren that he had seen the figure go from the

cafeteria to the kitchen and then to the A-wing.  (Skop Dep. at 51.)

Skop also explained that the surveillance cameras at the school registered motion,

and he exported only the "clips" or small portions of the video surveillance that showed

movement because he was unable to save or export all of the video off the server because

the file was too large.  (*Id*. at 45-46.)  Skop further explained that he did not edit the

surveillance clips, but rather just saved portions of the video that registered motion.  (*Id*.)

The computer date and time stamped the clips automatically.  (*Id*.)

B.    Police Investigation

Warren Police Officer Dahlin responded to Defendant Sonnenfeld's report of the

theft and came into the school to speak with Defendant Sonnenfeld on November 28,

2012.[5]  (Ex. F, Dahlin Dep. at 14-18; Police Report at 7.)  Defendant Sonnenfeld

informed Officer Dahlin that $510 dollars was stolen from the safe in his office by using

the key he kept in his desk.  (Police Report, at 7.)  Defendant Sonnenfeld also informed

Officer Dahlin that a suspect was captured on video entering the dark second floor A-

Wing hallway but kept close to the lockers to conceal himself from the camera.  (Police

Report at 7.)

---

[5] Officer John Dahlin was originally a named defendant in this action but was dismissed
pursuant to a stipulation.  (ECF No. 40.)

Officer Dahlin also watched the video surveillance of the figure and noted that he could "see the suspect enter the hallway from the stairs, moved over to the south side of the hallway heading west, to the Athletic Department Office and entered the locked room. The suspect was in the office for approximately 5 min and then was observed leaving, taking the same route back to the stairs." (*Id*.). Officer Dahlin described the figure as "male, wearing a heavy coat, and skinny legs." (*Id*.)

Defendant Sonnenfeld informed Officer Dahlin that he believed one of the custodians, Plaintiff Daniel Zavatson, was responsible for the theft. (*Id*.; Sonnenfeld Dep. Vol. II, at 47.) Defendant Sonnenfeld explained that he had reviewed surveillance footage from November 20, 2012 and determined that there were only five custodians working that night and he was able to find four of the five custodians, actually working, on the video and could identify them through the footage. (Sonnenfeld Dep. at 46-49; Police Report at 7.) Defendant Sonnenfeld also informed Officer Dahlin that Plaintiff was assigned to clean offices and hallways in the A-Hall and had keys to the Athletic Office and the desk where the key to the safe was kept. (*Id*. at 7-8.) Finally, Defendant Sonnenfeld reported that unknown amounts of money were possibly missing from the business department and from a teacher's desk in the same area as the Athletic Office – where Plaintiff is assigned to clean. (Police Report, at 8.)

Defendant Warren Police Officer Donald Seidl was assigned to the investigation on November 28, 2012. (Police Report at 8.) On November 30, 2012, Defendant Seidl met with Principal Schultz who provided him with the surveillance video from November

20, 2012.  (*Id*. at 9.)  Principal Schultz and Defendant Seidl reviewed the video together and Defendant Seidl noted that the figure appeared to a "male with skinny legs" and that the figure stayed in the darkness and was wearing a hooded jacket that made it "difficult to make out any facial features."  (*Id*.)  Principal Schultz advised Defendant Seidl that two male custodians were working that night, Michael McConnell and Plaintiff.  (*Id*.)  However, prior to the figure entering the Athletic Office and the theft, McConnell was captured on video surveillance working in a different part of the building wearing a short-sleeved shirt and Plaintiff was seen walking into the break room.  (*Id*.)  Defendant Seidl also noted in his Report that Plaintiff was captured on video surveillance exiting the break room after the theft occurred.  (*Id*.)  Defendant Seidl further observed in this report that there was no surveillance video of the inside of the break room.

On December 3, 2012, Defendant Seidl interviewed all of the custodians who had worked on November 20, 2012, except Plaintiff .  Plaintiff was not interviewed because he was assigned to work at a different school that day.  (*Id*. at 10-11, Ex. G, Seidl Dep. at 82-83.)  Defendant Seidl also visited the custodian break room on December 3, 2012 to see if there was a second access door.  (*Id*., Seidl Dep. at 91.)  Defendant Seidl made note in his report that a blue hooded jacket matching the description of the jacket worn by the suspect seen on the video surveillance was hanging on a coat rack in the break room. (*Id*.)  Defendant Seidl also confirmed that there was a second access door to the break room.  Defendant Seidl noted that the second door led to a former print room that was attached to the break room and Defendant Rainwater, Plaintiff's supervisor, explained to

Defendant Seidl that a person "if not wanting to be seen, would have exited the break room through the print room, cut through the cafeteria, then up the stairs because that route is the darkest and the furthest from the surveillance cameras." (Police Report, at 11; *see also* ECF No. 62, Pl.'s Resp. to Seidl/City of Warren Mot., Ex. K, Asocar Dep. at 44, 50, confirming there are two doors into the break room, one in a vestibule that leads directly into the break room, the second door that leads into a former print room that was attached to the break room, both doors are on the D-Hall.)

On December 13, 2012, Defendant Seidl met with Skop to review the surveillance video again. (Police Report at 12.) Skop explained to Defendant Seidl that while reviewing the surveillance video from November 20, 2012, he had discovered a figure walking up the stairway of the A-Hall east exit to the second floor, then another camera showed that figure walking down the A-Hall to the Athletic Director's office. (*Id.*) At 22:28 (10:28 p.m.), the figure was seen entering the Athletic Director's office, and then seen exiting the same at 22:34 (10:34 p.m). (*Id.*) Another video surveillance clip showed Plaintiff enter the custodian break room at 22:10 (10:10 p.m.) and eventually exit at 22:37 (10:37 p.m.). (*Id.*; Skop Dep. at 34-35; *see also* Ex. J, surveillance videos.)

Defendant Seidl eventually interviewed Plaintiff on December 18, 2012 at the police station and in the presence of Plaintiff's attorney. (Police Report, at 12-13.) Plaintiff confirmed that he, like the other custodians, had a master key and that he was assigned to clean the second floor A-Hall. (*Id.* at 12.) Plaintiff could not recall if he cleaned the Athletic Director's office on November 20, 2012 and could not recall when

10

he took his late break on November 20, 2012.  (*Id*.)  Plaintiff denied that he took any money from the Athletic Director's office.  (*Id*. at 12-13.)  Following the interview, Plaintiff's attorney indicated to Defendant Seidl that Plaintiff wished to take a polygraph test to prove his innocence.  Defendant Seidl scheduled the polygraph test for February 20, 2013.  (Police Report, at 13; Seidl Dep. at 89-90, 158.)

Thereafter, on January 8, 2013, Defendant Seidl arranged for teachers at Fitzgerald High School to walk down the hallways and stairwell pertinent to the investigation.  (Police Report, at 13.)  Defendant Seidl then compared the height of these teachers on the video (or still photographs of the video) to the height of the unidentified figure taken from the same camera in the same hallway on November 20, 2012.  (Seidl Dep. at 69-70; 91; Police Report at 13.)  Defendant Seidl "took scale measurements of the teachers" as they reached the top of the stairs in the A-Hall and compared those scale measurements to the scale measurement of the figure in the surveillance video clip from November 20, 2012.  (Police Report at 13.)  The results of this comparison led Defendant Seidl to determine the figure in the surveillance video clip was approximately 5'10".  (*Id*.)  Defendant Seidl then concluded that Connie Asocar and Linda Rigney, both female custodians working the night of November 20, 2012, were "eliminated" as suspects because they were too short.  (*Id*.)  Additionally, Seidl eliminated McConnell as a suspect because he was seen working in the D-Hall at the time the suspect figure is captured on the surveillance video going into the Athletic Director's office.  (*Id*.)  Defendant Seidl also eliminated Eyetoile Phillips as the unknown figure because of her weight and/or body type.  (*Id*.)  Plaintiff,

11

who was 5'10", was not eliminated by Defendant Seidl's height comparison test.

On January 18, 2013, Defendant Seidl returned to Fitzgerald High School and visited Defendant Sonnenfeld and Defendant Candela in their respective offices.  At that time, almost two months after the theft was reported, Defendant Seidl directed a Warren evidence technician to take pictures of both offices, the safes, and the location of the cabinets in each office where the keys were located.  (Police Report at 14.)  On that day, Defendant Candela informed Defendant Seidl that he had discovered money missing from his cash box in response to Defendant Sonnenfeld's request for money to replace the money missing from the Athletic Director's office.  (*Id*.)  Defendant Candela explained that his box was $250 dollars short and also relayed the fact that a school credit card was compromised on January 10, 2013, and a copy of that card was kept in his cash box.  (*Id*.)

C.    Warrant Request

On January 18, 2013, Defendant Seidl submitted an arrest warrant request against Plaintiff which was presented to Assistant Macomb County Prosecutor Heather Odgers. (Seidl Dep. at 103-07.)  The warrant request included Defendant Seidl's complete police report (Ex. E), Defendant Candela's witness statement (Ex. I), a video DVD of the surveillance video clips from November 20, 2012, the video Defendant Seidl created to compare heights (Ex. J), photographs of the business and athletic director offices, and copies of the drivers licenses of the teachers used in the height comparison.  (Seidl Dep. at 103-116.)  Defendant Seidl also testified that he spoke with Prosecutor Odgers prior to her approval of the warrant request and informed her that he could not identify the figure

12

in the video surveillance footage from November 20, 2012 because "you can't see his face, but there was evidence to believe that Daniel Zavatson was that individual." (*Id.* at 62:21-24, 63.)

Defendant Seidl provided the following summary of the offense in his warrant request:

> On 11-20-12 at 2227 hrs Zavatson, while working at 23200 Ryan he [sic] stole money from the Athletic Department's safe located in the Athletic Director's Office. Daniel used keys and safe combo to steal $510 from the safe. Daniel further stole an additional $250 from the business office safe. That safe was located in a storage room next to the office. The keys to the safe and the cash box were hidden in two different filing cabinets in his office. The theft from the Athletic Director's Office was caught of [sic] video and Daniel is the only custodian matching the physical description fo the suspect and is assigned to that area[.]

(Ex. H, Warrant Request.)

On January 22, 2013, Prosecutor Odgers authorized the arrest warrant for Plaintiff on two counts of larceny in a building. (Ex. K, Felony Complaint.) Plaintiff was advised to turn himself into the police. On January 24, 2013, Plaintiff turned himself in and was arraigned that same day. (Seidl Dep. at 152, Police Report at 15.) Plaintiff was released on $50,000 personal bond. (Police Report at 15.)

D.     Preliminary Examination

On March 4, 2013, a preliminary examination was held before Judge Jennifer Faunce, in the 37th Judicial District Court for the County of Macomb. (Ex. L, Prelim. Exam Hrg. Trans.) The prosecution called four witnesses to support its case: Gary Skop, Defendant Seidl, Defendant Sonnenfeld, and Defendant Candela. Skop testified as to

how he downloaded the video clips and as to what he saw in the video clips, including testimony that he saw a shadowy figure "dart out of the break room or the access door to the break room across the hall," later clarifying that he saw a figure dart out of the print shop, which is attached to the break room. (*Id*. at 63-65.)

At the conclusion of the hearing Judge Faunce dismissed the second count of larceny based on the alleged theft from the Business office but bound over Plaintiff on the first count of larceny based on the alleged theft from the Athletic Director's office. (*Id*. at 110-11.) In finding probable cause to support the first count of larceny from the Athletic Director's office, Judge Faunce acknowledged that all the evidence was "circumstantial" but relied upon evidence including the video clips, Defendant Sonnenfeld's testimony regarding the missing key and funds, and Defendant Seidl's height comparisons, as well as the fact the theft was committed by someone who was in the building or had a master key. (*Id*. at 109-10.) In dismissing the second count of larceny based on the alleged theft from the Business office, Judge Faunce noted that the alleged larceny from the Business office was "a little bit more troublesome" than the theft from the Athletic Director's office "even though they were similar in nature" because "there's almost a six month period or at least a five month period of when [the theft] could have happened, with no indication or testimony of anyone seeing anyone coming or going out of [Defendant Candela's] office." (*Id*.)

On March 6, 2013, almost four months after the theft allegedly occurred and at the urging of a prosecutor assigned to the case, Defendant Seidl requested that the safe that

14

was in Athletic Director's office on November 20, 2012 be fingerprinted.  (Seidl Dep. at 92-97, 133-37.)  Defendant Seidl had been unaware that Defendant Sonnenfeld remained in possession of the safe that was allegedly compromised.  (*Id*.)  On May 30, 2013, two months after collecting the fingerprints and after discovering the request to review the prints had not yet been made, Defendant Seidl requested a specialist review the prints and compare them to Plaintiff's fingerprints.  (*Id*. at 134-35; ECF No. 62, Pl.'s Resp. Ex. P at 1, Latent Print Examination Form.)  In July, 2013, Defendant Seidl received a report concluding that the prints collected from the safe in Defendant Sonnenfeld's office did not match Plaintiff's fingerprints.  (*Id*. at 118, 120; ECF No. 62, Pl.'s Resp. Ex. P at 2, Warren Police Depart. Forensic Exam Report.)

　　　E.　　Motion to Quash

　　　On May 28, 2013, Plaintiff's attorney filed a motion to quash which was heard by visting Judge Thomas W. Brookover.  (Ex. M, Motion to Quash Hrg. Trans.).  Plaintiff's counsel argued that the video established Plaintiff was in the break room from 22:10 until 22:36 - the time that the unidentified figure is seen entering the Athletic Director's office.  (*Id*. at 5).  Plaintiff's attorney presented the court with new evidence that Plaintiff had recently passed a polygraph test.[6]  (*Id*. at 6).  Judge Brookover granted the motion to quash, explaining

---

[6] Plaintiff took his polygraph test on May 24, 2013.  (ECF No. 62, Pl.'s Resp. Ex. Q, Polygraph Test Results.)

> [Judge Faunce] did dismiss one of the counts.  But, even in reviewing the transcript, it's clear that she was less than overly persuaded to bind over on this matter, and I find that there was not, the People did not establish probable cause that the [Plaintiff Zavatson] was the person who committed the crime, if there was one committed.  I will grant the Motion to Quash.

(*Id*. at 7.)

## II. STANDARD OF REVIEW

Defendants and the Plaintiff have moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact."  *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).  However, in making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving

16

party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## III. ANALYSIS

A.    Defendant Seidl

1.    42 U.S.C. § 1983

Both Plaintiff and Defendant Seidl have moved for summary judgment on Plaintiff's claim that Defendant Seidl violated Plaintiff's constitutional right to be free from false arrest and malicious prosecution pursuant to 42 U.S.C. § 1983.

In order to make a claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish a violation of an existing constitutional right by a person acting under color of state law.[7] *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). Section 1983, however, does not confer any substantive rights but rather affords a means to "vindicate rights conferred by the Constitution or laws of the United States." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010). In the present case, Plaintiff alleges that Defendant Seidl violated his right to be free from false arrest and malicious prosecution pursuant to the Fourth Amendment.

Defendant Seidl contends that regardless of whether Plaintiff's constitutional rights were violated, he is entitled to qualified immunity. The doctrine of qualified immunity generally protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009). The purpose of qualified immunity is to "shield the official from suit altogether, saving him or her from the burdens of discovery and costs of trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

A government official is entitled to qualified immunity "unless a plaintiff pleads facts showing: "(1) that the official violated a statutory or constitutional right and (2) that

---

[7] In the present case, it is undisputed that Defendant Warren Police Office Seidl was operating under the color of state law.

the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, --- U.S. --- , 131 S. Ct. 2074, 2080 (2011) (citation omitted). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014). "[I]f genuine issues of material fact exist as to whether the officer[s] committed acts that would violate a clearly established right, then summary judgment is improper." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011); *see also King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012), *cert. denied*, --- U.S. ----, 133 S.Ct. 1473 (2013).

The order of this inquiry is no longer mandatory and courts are allowed to use their discretion in deciding which of the two steps of the qualified immunity analysis should be addressed first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Once a government official has raised the defense of qualified immunity, the plaintiff must bear the burden to demonstrate that the defense is unwarranted. *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2007). A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

a.   Illegal Search and Seizure

When qualified immunity is asserted, the issue of probable cause is an issue for the court because "the entitlement is immunity from suit rather than a mere defense to liability.'" *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991).

Generally, "[a] false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005). Yet, the Sixth Circuit has recognized that when an arrest is made pursuant to a "facially valid" arrest warrant, as in the present case, such a fact is "normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983." *Id.* (citation omitted). However, a claim for false arrest will lie when there is evidence that the defendant "'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'" *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (citation omitted) (alterations in *Sykes*); *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (establishing a two prong standard in the context of cases alleging false statements in arrest warrants requiring a plaintiff establish (1) a "substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth, and (2) that the allegedly false or omitted information was material to the finding of probable cause" to overcome qualified immunity.); *see also Voyticky*, 412 F.3d at 677 n. 4. "If the affidavit contains false statements or material omissions, [the court is to] set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause." *Sykes*, 625 F.3d at 305. This standard has been recognized as "clearly established." *Kuslick v. Roszczewski*, 419 F. App'x 589, 592 (6th Cir. 2011)

20

(finding that the standard set forth in *Vaklilian* was "clearly established" at least as early as 2008) (citing *Peet v. City of Detroit*, 502 F.3d 557, 570 (6th Cir. 2007)).

"[P]robable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Sykes*, 625 F.3d at 306 (citation omitted). A court must "consider the totality of the circumstances and whether the facts and circumstances of which [the officer] had knowledge at the moment of the arrest were 'sufficient to warrant a prudent person in believing that' the seized individual had committed an offense." *Id.* (citation and some internal alterations omitted).

1. Collateral Estoppel

As an initial matter, Plaintiff appears to argue that Judge Faunce's initial dismissal of Count II at the preliminary examination and Judge Brookover's subsequent decision granting Plaintiff's motion to quash as to Count I precludes Defendant Seidl from arguing that probable cause existed at the time the arrest warrant was issued. Plaintiff claims that these "judicial determinations are absolutely dispositive." (ECF No. 62, Pl.'s Resp. to Seidl and City of Warren Mot., at 26.) To this end, Plaintiff exclusively relies upon the district court decision, *Bourgeois v. Strawn*, 452 F. Supp. 2d 696 (E.D. Mich. 2006) (Lawson, J.).

Plaintiff's reliance on *Strawn* is misplaced, however, because *Strawn* is both legally and factually distinguishable from the present action. In *Strawn*, the arrest at issue was a warrantless arrest and this fact alone distinguishes *Strawn* from the present action. Additionally, the defendant police officer argued that the criminal-defendant-turned-

21

plaintiff was collaterally estopped from re-litigating the issue of probable cause in his

federal civil rights action because a state court judge had bound the plaintiff over at a

preliminary examination.  On this issue, the *Strawn* court examined whether collateral

estoppel applied under Michigan law and held the defendant officer could not benefit

from the state court decision regarding probable cause because it was not the final court

to address the issue and also because the officer was not a party to the criminal case.[8]  *Id.*

at 708 (citation omitted); *see also Burda Brothers, Inc. v. Walk*, 22 F. App'x 423, 430

(6th Cir. 2001) (recognizing that in a §1983 action, a criminal-defendant-turned-plaintiff

cannot use collateral estoppel offensively against a defendant police officer, because

police officers are not in privity with the prosecution in the criminal case.); *Hardesty v.*

*Hamburg Twp.*, 461 F.3d 646, 651 (6th Cir. 2006) (finding same and collecting

authority).  The *Strawn* court then concluded that it was the duty of the court to

"independently determine if the arrest was supported by probable cause."  *Strawn*, 452 F.

Supp. 2d, at 708.

In the present case, Plaintiff is attempting to "offensively" use collateral estoppel

against Defendant Seidl to assert that because "both counts were dismissed in the manner

---

[8] Under Michigan law:

[a] court must apply issue preclusion when 1) the parties in both proceedings are
the same or in privity, 2) there was a valid, final judgment in the first proceeding,
3) the same issue was actually litigated in the first proceeding, 4) that issue was
necessary to the judgment, and 5) the party against whom preclusion is asserted
(or its privy) had a full and fair opportunity to litigate the issue.

*Id.* (quoting *United States v. Dominguez*, 359 F.3d 839, 842 (6th Cir. 2004)).

in which they were, there was never probable cause for the arrest." (ECF No. 62, Pl.'s Resp. to Seidl/City of Warren MSJ at 26-28.) First, it is well established that "[a] valid arrest based upon then existing probable cause is not vitiated if the suspect is later found innocent." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988); *see also Manley v. Paramount's Kings Island*, 299 F. App'x 524, 530 (6th Cir. 2008). Further, as set forth in *Strawn*, as individual like Defendant Seidl, who was not a party to the criminal proceeding, cannot be bound by the state court's decision. *See Hardesty*, 461 F.3d at 651. The Sixth Circuit has explained that "even when a state court dismissed a charge for lack of probable cause to prosecute, a federal court in a subsequent § 1983 action for Fourth Amendment violations should not entertain a § 1983 suit if it finds no genuine issue of material fact as to probable cause to arrest." *Manley*, 299 F. App'x at 530-31 (relying upon *Voyticky* and collecting authority). Accordingly, the Court rejects Plaintiff's argument that Defendant Seidl is now collaterally estopped from asserting there was probable cause for Plaintiff's arrest.

　　2.　　Probable Cause

　　Plaintiff also maintains that Defendant Seidl did not have probable cause to request a warrant for his arrest. However, even taking the facts in a light most favorable to Plaintiff, the totality of the circumstances known to Defendant Seidl at the time he requested the warrant evidences that he had reasonable grounds for his belief – probable cause – that Plaintiff had committed thefts at Fitzgerald High School. To wit, Defendant Seidl had a witness who claimed that money had been taken from the safe in the Athletic

office on or about November 20, 2012; and another witness on the same hallway who had similarly discovered money missing from the secure safe in the Business Office at the same time; Plaintiff had access to both offices, the keys, and/or the combination to the safes; and video surveillance existed that showed an unidentified figure entering the Athletic Office late at night on November 20, 2012 a few days before the money was discovered missing in the Athletic Office.  Additionally, Plaintiff worked the night of November 20, 2012 and there was nothing to indicate that Defendant Sonnenfeld or Defendant Candela were untrustworthy witnesses or not otherwise credible.  Defendant Seidl has also further pursued his investigation to rule out the other custodians as the unknown figure on the video clip by their height or body type.  Critically, while the surveillance video shows Plaintiff in the break room during the time the unknown figure enters the Athletic Office, Defendant Seidl was aware that there was a second access door to the break room and noted witness testimony that "if not wanting to be seen" a person could exit the break room "through the print room, cut through the cafeteria, then up the stairs because that route was the darkest and the furthest from the surveillance cameras." (Police Report, at 11, quoting Defendant Rainwater.)  Given these uncontroverted facts, the Court finds that Defendant Seidl had probable cause to request a warrant for Plaintiff's arrest.

       3.      Arrest Warrant

Plaintiff was arrested pursuant to a facially valid arrest warrant issued by a prosecutor.  "The Fourth Amendment requires that arrest warrants be issued only upon a

24

showing of probable cause.  In a civil rights case, investigators are entitled to rely on a

judicially-secured arrest warrant as satisfactory evidence of probable cause." *Vakilian*,

335 F.3d at 517 (internal citations omitted).   Accordingly, an investigator, such as

Defendant Seidl, can only be held liable "for requesting a warrant which allegedly led to a

false arrest if he 'stated a deliberate falsehood or acted with a reckless disregard for the

truth.  Proof of negligence or innocent mistake is insufficient.'" *Ahlers v. Scheil*, 188

F.3d 365, 373 (6th Cir. 1999) (citation omitted).  Thus, the pertinent question in this

action is whether Defendant Seidl stated deliberate falsehoods or acted with a reckless

disregard for the truth in his request for Plaintiff's arrest warrant and "such statements or

omissions [we]re material, or necessary, to the finding of probable cause." *Sykes*, 625

F.3d at 305 (citation omitted).

        To this end, Plaintiff argues that Defendant Seidl's warrant request contained

certain false or misleading statements.  (*See* ECF No. 61, Pl.'s Mot., Ex. BB, Chart.)  To

wit, Plaintiff contends almost the entirety of the "summary of offense" on the warrant

request was misleading or false.  Plaintiff claims that the first sentence in the request for

an arrest warrant is false because although it stated that Plaintiff "stole money from the

Athletic Department's safe" on November 20, 2012, Defendant Seidl admitted he had no

physical evidence of a theft and because Defendant Seidl admitted that he did not have

"solid" evidence that a theft was committed.[9]  (Ex. BB, Chart; Seidl Dep. at 121-124.)

---

[9] Plaintiff repeatedly argues and represents that Defendant Seidl lacked any "evidence" to
support his belief that a theft occurred and admitted as much in his deposition.  However, in

The Court finds that this statement is not misleading but rather merely a summary of the crime and was not material to the finding of probable cause.  (*See* ECF No. 62, Pl.'s Resp. to Seidl/City of Warren Mot., Ex. G, Odgers Dep. at 22, 27-28 noting that the summary of the offense is not evidence and that she would "absolutely" not rely upon the summary of the offense in her probable cause determination, but rather upon the investigative report and supporting materials.)  It is undisputed that Defendant Seidl turned over his entire report, including the video surveillance, with his request for an arrest warrant.  Prosecutor Heather Odgers, who reviewed the request for the warrant, testified that she would have reviewed the entire case file turned over by Defendant Seidl before issuing an arrest warrant.  (Odgers Dep. at 27-28.)  Thus, the lack of physical evidence would have been apparent from the file and thus not material to any probable cause determination by the prosecutor.

Plaintiff next claims the statement "Daniel used keys and safe combo to steal $510 from the safe" was misleading or a false statement because Defendant Seidl did not have any "physical evidence" and other people had access to the combination of the safe.  (*See* Ex. BB, Chart.)  The Court finds that this sentence was not false or misleading because (1) Defendant Sonnenfeld informed Defendant Seidl that the key to his safe was missing, and (2) there was no damage to the safe.  Given this information, it is a reasonable

---

reviewing the deposition in its entirety, Defendant Seidl only admits that he had no *physical evidence* of a theft, but clearly testified, at length, that he relied upon circumstantial evidence to conclude a theft occurred.  (Seidl Dep. at 122-30.)

26

inference that if money was taken from the safe, a key and combination were used. Additionally, as stated above, the lack of physical evidence connecting Plaintiff to these thefts would be apparent from the investigation file that Defendant Seidl turned over to the prosecutor and therefore, this statement could not have been material to the finding of probable cause.

Plaintiff contends that Defendant Seidl's statement that "The theft from the Athletic Director's Office was caught of [sic] video and Daniel is the only custodian matching the physical description of the suspect and is assigned to the area" is false and misleading. (Ex. BB, Chart.) Plaintiff argues this statement is false and misleading because the figure on the video could not be specifically identified, the theft was not actually caught on video, and that the figure in the video may not have actually stolen anything. (*Id.*) The Court finds that this statement, even if it is false or misleading because the theft was not captured on film, cannot be found to be material or necessary to the finding of probable cause because the videos and Defendant Seidl's report were turned over to the prosecutor. Indeed, the report makes clear that the theft itself was not captured on film, and the video does not actually show the theft occurring. Further, Defendant Seidl testified that he verbally informed Prosecutor Odgers that the figure in the video could not be identified before she signed the warrant. (Seidl Dep. at 62:21-24, 63.)

Finally, Plaintiff claims Defendant Seidl's statement "Daniel further stole an additional $250 from the business office safe" was false and misleading because he later

admitted during his deposition that at the time he requested the arrest warrant he had not done any investigation into the theft from the business office and he had no evidence that there was a theft from that office.  (Ex. BB, Chart.)  First, it is clear that this statement is a summary of an alleged crime.  Further, Plaintiff has wholly failed to show that this statement was material to finding probable cause to issue the arrest warrant, especially in light of Odger's testimony that she would not have relied upon the summary in making her decision to issue the warrant.  (Odgers Dep. at 22, 27-28.)  Defendant Seidl's report detailed the fact that there was no physical evidence supporting the finding that there was a theft (beyond a witness's testimony that money was missing from a safe), and also included Defendant Candela's statement regarding the second theft that did not mention Plaintiff, and noted that the petty cash box had not been opened since June 2012.  (Ex. I, Candela Investigation Report.)  However, Defendant Seidl's report also set forth that Plaintiff had a master key (and therefore access) into the business office and that he was assigned to work in that same area.  Additionally, the report detailed Defendant Seidl's investigation into the theft from the Athletic Office down the hall and Defendant Seidl's determination based on the video clip that the person who took the money from the Athletic Office was the same height as Plaintiff.  Prosecutor Odgers noted that if the file had contained "no evidence" to support the charge she would not have signed the warrant. (*Id.* at 22, "If he had no evidence, I don't believe I would have signed it.")

In sum, Plaintiff claims the majority of the summary of the offense on the warrant request was false or misleading but fails to make any showing or set forth any argument

regarding the *materiality* of those statements in Defendant Seidl's warrant request in regards to the finding of probable cause or with the issuance of the arrest warrant. *Sykes*, 625 F.3d at 305. In fact, as noted above, Prosecutor Odgers testified that she "absolutely" would not have relied upon that summary paragraph in making her determination regarding probable cause. (Odgers Dep. at 22, 27-28.)

Even assuming that the summary of the offense was misleading or false, excising those statements from the warrant request leaves the police file and other materials in Defendant Seidl's investigation file that the prosecutor relied upon. *See Bailey v. City of Howell*, --- F. App'x --- , 2016 WL 1042834, at *6 (6th Cir. 2016). Plaintiff has failed to show that the totality of Defendant Seidl's investigative materials, including the video surveillance, did not establish probable cause. Indeed, while Defendant Seidl's investigation is not the paradigm of investigatory prowess, the shortcomings of Defendant Seidl's investigation were clearly evident from his case report and the video clips. Tellingly, Plaintiff has not specified any portion of Defendant Seidl's case report that was false or misleading.

Plaintiff also argues that Defendant Seidl's investigation was poorly conducted. Plaintiff, however, does not cite any case law indicating that a sloppy or poorly conducted investigation is sufficient to overcome the "complete defense" to a false arrest claim where a facially valid warrant was issued. Rather, the case law indicates the opposite. *See Ahlers*, 188 F.3d at 373-74 (holding in the context of an arrest pursuant to a warrant that "[a]t best, however, the investigation's lack of thoroughness might support an

29

inference of negligence, but it does not demonstrate knowing or intentional behavior designed to violate Ahler's constitutional rights."); *Sykes*, 625 F.3d at 305.  Finally, Plaintiff's arguments, in both his motion for summary judgment and in response to Defendant Seidl's motion for summary judgment, are almost exclusively based on case law that relate to warrantless arrests: in other words, case law that is not relevant and is factually distinguishable from the present case. *See e.g., Hinchman v. Moore*, 312 F.3d 198, 205 (6th Cir. 2003) (regarding a warrantless arrest);  *Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999) (regarding a warrantless arrest); *Strawn*, 452 F. Supp. 2d 696 (regarding a warrantless arrest).

For all these reasons, the Court finds that Plaintiff has failed to establish that Defendant Seidl included deliberate falsehoods or acted with a reckless disregard for the truth in his request for Plaintiff's arrest warrant and that such statements or omissions were material to the finding of probable cause.  Accordingly, the Court will grant Defendant Seidl's motion for summary judgment on this claim because there was no constitutional violation and deny Plaintiff's motion for summary judgment for the same reason.

Alternatively, even if Plaintiff could establish a factual issue as to whether probable cause existed or whether his constitutional rights were violated, Defendant Seidl is entitled to qualified immunity for his actions because a reasonable officer would have

believed that probable cause existed to seek the warrant for Plaintiff's arrest.[10]

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v Creighton*, 483 U.S. 635, 639 (1987) (citation omitted). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, --- U.S. --- , 132 S.Ct. 1235, 1244-45 (2012) (quoting *Ashcroft v. al-Kidd*, --- U.S. --- , 131 S.Ct. 2074, 2085 (2011)). "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344 (1986) (internal citations omitted).

In the present case, the fact that a prosecutor independently reviewed and approved the issuance of an arrest warrant (as to both Counts I and II), and a judge then bound

---

[10] Plaintiff makes a vague argument that qualified immunity cannot be granted because there are unresolved issues of fact. "Where qualified immunity is asserted, the issue of probable cause is one for the court since 'the entitlement is immunity from suit rather than a mere defense to liability.'" *Vakilian*, 335 F.3d at 517 (citation omitted). Here, Plaintiff did not identify any underlying facts that are disputed. Indeed, even when viewing the facts in a light most favorable to Plaintiff, there are no material issues of fact in dispute regarding the underlying events leading up to Plaintiff's arrest and prosecution: Plaintiff merely disputes the sufficiency and competency of Defendant Seidl's investigation.

Additionally, Plaintiff does not substantively address whether qualified immunity applies and merely recites the general legal standards on the issue. It is Plaintiff's burden to rebut the defense of qualified immunity once it is raised, and Plaintiff's failure to address the issue can be seen as a concession of this issue. *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2007).

Plaintiff over at the preliminary exam (as to Count I) substantiates that an officer of reasonable competence would have found probable cause existed for Plaintiff's arrest on the facts known to him at the time he requested the warrant. "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or as we have sometimes put it, in 'objective good faith.'" *Messerschmidt*, 132 S.Ct. at 1245 (citing *United States v. Leon*, 468 U.S. 897, 922-23 (1984)). The Supreme Court has made clear that the threshold for establishing the exception to a warrant is a "high one" because "'[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination' because 'it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, issue a warrant comparting in form with the requirements of the Fourth Amendment.'" *Id.* (citation omitted)).

The Court finds that the fact a neutral prosecutor issued a warrant against Plaintiff as to both counts and a neutral judge bound Plaintiff over as to one count, substantiates that a reasonably competent officer would have believed probable cause existed to seek an arrest warrant. Accordingly, the Defendant Seidl is entitled to qualified immunity on this claim.

b.    Malicious Prosecution

In the present action, both Plaintiff and Defendant Seidl move for summary judgment on Plaintiff's malicious prosecution claim pursuant to § 1983. "The tort of

32

malicious prosecution is entirely distinct from that of false arrest, as the malicious-prosecution tort remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process." *Sykes*, 625 F.3d at 308 (6th Cir. 2010) (emphasis in original but citation and internal quotation marks omitted). To set forth a Fourth Amendment malicious prosecution claim under § 1983, "a plaintiff must prove the following: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014) (citation omitted); *Sykes*, 625 F.3d at 308. A finding of actual malice is not needed to establish such a claim. *Sykes*, 625 F.3d at 309.

As an initial matter, because the Court has concluded that Defendant Seidl had probable cause to request an arrest warrant, discussed *supra*, Plaintiff's claim for malicious prosecution fails for the same reason. Plaintiff does not contend that there was any difference between the facts or circumstances known to Defendant Seidl at the time he requested the warrant for an arrest versus when the criminal proceeding against Plaintiff was commenced. *See Mott v. Mayer*, 524 F. App'x 179, 187-88 (6th Cir. 2013) (finding that "whether probable cause exists to arrest a suspect is a distinct question from whether probable cause exists to prosecute an accused.").

33

Plaintiff's federal malicious prosecution claim also fails because he cannot evidence that Defendant Seidl "made, influenced, or participated in the decision to prosecute." *Robertson*, 753 F.3d at 616. The Sixth Circuit has explained, "[i]t is absolutely clear ... that an officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's *truthful* materials." *Sykes*, 625 F.3d at 314 (citation omitted). An officer may be liable for malicious prosecution when he or she makes "materially false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest." *Id*. (citation and quotation marks omitted).

Here, Defendant Seidl turned over the whole of his case report, notes, and evidence. Plaintiff has made allegations that he made misstatements in his request for the warrant, however, has not specified with any particularity what, if anything, he omitted from his case report. Plaintiff also does not assert that Defendant Seidl lied during the preliminary exam. (*See* Compl.) Rather, the only predicate for liability that Plaintiff appears to assert relates to the allegedly misleading or false statements in Defendant Seidl's summary request for a warrant.[11]

---

[11] The Court notes that Plaintiff's briefing does not specify the exact basis for his malicious prosecution claim and only states in a conclusory fashion that "[b]ased on the totality of the record, there is absolutely no doubt that Defendant Seidl participated or played an active role in the decision to have Plaintiff arrested." (ECF No. 62, Pl.'s Resp. to Seidl/City of Warren Mot. at 29.) This is the whole of Plaintiff's legal reasoning. (*See also* ECF No. 61, Pl.'s Mot., concluding without argument that "no reasonable minds could dispute the fact that Defendants lacked probable cause to believe Plaintiff was involved in any sort of crime whatsoever...").

In *Sykes*, the Sixth Circuit examined a malicious prosecution claim against an officer whose involvement in the prosecution consisted only of submitting an arrest-warrant application and investigative report, which was presented to a prosecutor and approved by a magistrate.  Similar to the present case, the plaintiffs in *Sykes* argued that the officer had made affirmative misrepresentations and omissions from his application and report.  The Sixth Circuit held that to find the officer had influenced or participated in the decision to prosecute: "the Plaintiffs were required to present some evidence that the impact of [the officer's] misstatements and falsehoods in his investigatory materials extended beyond the Plaintiffs' initial arrest and ultimately influenced the Plaintiffs' continued detention."  *Sykes*, 625 F.3d at 316.  The Sixth Circuit noted that such influence could also be based on "knowing misstatements to the prosecutor or his pressure or influence."  *Id*. (internal quotation marks removed).

The Court finds Plaintiff has failed to show that Defendant Seidl's misstatements in his warrant request influenced or had any affect on Judge Faunce's decision at the preliminary examination.  First, Judge Faunce while finding that probable cause was established as to the first count, also found there was not probable cause on the second count of larceny and dismissed the charge.  Second, Defendant Seidl's testimony at the preliminary examination clearly negated the allegedly false or misleading statements in his warrant request.  In the Preliminary Exam, Defendant Seidl testified that: the figure in the video clip might not have taken the money from the Athletic Office (Ex. L, Preliminary Exam at 93); he never reviewed all of the surveillance video from November

35

20, 2012 (*id.*, at 95); he was unaware whether anyone else was in the building that night (*id.*, at 93); the only evidence that the money was stolen from the Athletic Office was the Defendant Sonnenfeld's testimony (*id.*, at 91-92); admitted the crime might have taken place on a different day (*id.*, at 92); could not identify Plaintiff in the video clip (*id.*, at 93); he was unaware when the money was taken from Defendant Candela's office and it was possible the money could have been taken any time between June and November 2012 (*id.*, at 94); Defendant Candela never told him when he thought the money was taken (*id.*, at 95); and he had no video evidence regarding the theft from Defendant Candela's office (*id.*, at 94). Judge Faunce also reviewed the video surveillance during the preliminary exam.

Thus, it is clear that while Defendant Seidl testified as to all of the incriminating evidence against Plaintiff, it is also clear that he testified to all of the exculpatory evidence that Plaintiff relies on to argue that the statements on his warrant request were misleading or false. (*Cf.* Ex. BB, Chart.) Plaintiff has also not alleged that Defendant Seidl exerted any pressure or influence over the prosecution during the preliminary exam or made any false statements during his testimony.

Therefore, the Court finds Defendant Seidl did not make, influence, or participate in the decision to prosecute Plaintiff and Defendant Seidl's motion for summary judgment must be granted. Plaintiff's motion for summary judgment on this claim must also be denied for the same reasons.

2.      State Law Claims against Seidl

Plaintiff and Defendant Seidl both move for summary judgment on the state law claims of false arrest/false imprisonment and malicious prosecution.  Defendant Seidl also moves for summary judgment on the state law claims of abuse of process, gross negligence, and intentional infliction of emotional distress.

a.      False Arrest/False Imprisonment

Plaintiff alleges that Defendant Seidl both falsely arrested and imprisoned him in violation of Michigan law.  Defendant Seidl argues that he is entitled to governmental immunity on that claim.

In *Odom v. Wayne County*, 482 Mich. 459 (2008), the Michigan Supreme Court explained the proper method for determining whether governmental immunity is applicable to intentional torts under Michigan law, such as assault and battery and false imprisonment, is to use the test set forth in *Ross v. Consumers Power Co.*, 420 Mich. 567 (1984).  *See Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011).  The test in *Ross* provides that "an employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the employee undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature."  *Id*. (citing *Odom*, 482 Mich. at 480).  Unlike qualified immunity, it is the employee who is seeking governmental immunity who bears the burden in establishing that he or she is immune from the plaintiff's claims.  *Id*. (citation

37

omitted).

Even viewing the facts in a light most favorable to Plaintiff in the present case, Plaintiff has not established that Defendant Seidl acted in bad faith or with malice, but rather he has established at most, only that Defendant Seidl conducted a less than fully thorough investigation.  Regardless, a claim of false arrest under Michigan law is an "illegal or unjustified arrest."  *Lewis v. Farmer Jack Div., Inc.*, 415 Mich. 212, 218 (1982).  Therefore, where an arrest is legal, even if the person is innocent, a claim of false arrest cannot be sustained.  *Id*. n. 2.  False imprisonment is defined in Michigan as "an unlawful restraint on a person's liberty or freedom of movement."  *Peterson Novelties, Inc. v. Berkley*, 259 Mich. App. 1, 17 (Mich. Ct. App. 2003) (citation omitted).  "To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause."  *Id*. at 18 (citation omitted).  Because the Court has concluded Defendant Seidl had probable cause to request an arrest warrant and because the arrest was secured by a facially valid arrest warrant, the Court will grant Defendant Seidl's motion for summary judgment as to false arrest and deny Plaintiff's motion for summary judgment on this claim.

> b.    Malicious Prosecution

To maintain a malicious prosecution claim under Michigan law, a plaintiff has the burden of proving that (1) the defendant has initiated a criminal prosecution against him, (2) the criminal proceedings terminated in his favor, (3) the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the

38

action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice." *Miller v. Sanliac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010) (quoting *Walsh v. Taylor*, 263 Mich. App. 618, 632-33 (Mich. Ct. App. 2004)).

As examined *supra*, the Court found Defendant Seidl had probable cause to support Plaintiff's arrest. Thus, Plaintiff's state law claim of malicious prosecution fails. Plaintiff also failed to set forth any evidence that Defendant Seidl intentionally misrepresented facts to the prosecutor or the judge at the preliminary exam. Accordingly, the Court will grant Defendant Seidl's motion for summary judgment on this claim and deny Plaintiff's motion for summary judgment.

c.    Abuse of Process

In Michigan, to establish an abuse of process claim, "a plaintiff must prove: '(1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceedings.'" *Garcia v. Thorne*, 520 F. App'x 304, 311 (6th Cir. 2013) (quoting *Friedman v. Dozorc*, 412 Mich. 1, 29 (1981)). However, courts have made clear that the misconduct at issue "is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." *Id.* (citing *Friedman*, at 29 n. 18).

In the present case, Plaintiff did not make any reasoned argument or cite any law to rebut Defendant Seidl's argument that summary judgment on this issue is appropriate. Pursuant to Rule 56, a non-moving party may not rest upon mere allegations or denials of

his pleadings, but must sent forth specific facts and introduce evidence of evidentiary quality to demonstrate there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e).

Moreover, the Court finds that Plaintiff's claim of abuse of process fails as a matter of law where Plaintiff has only alleged that Defendant Seidl was involved with the initiation of the criminal proceedings (*i.e.* securing an arrest warrant) rather than the misuse of criminal proceedings themselves. *See Garcia*, 520 F. App'x at 311 (finding same); *Spear v. Pendill*, 164 Mich. 620 (1911). Indeed, while Plaintiff's complaint provided that Defendant Seidl falsely testified before a judge or encouraged others to do so, Plaintiff did not present any evidence to support those allegations. (*See* Compl. ¶ 90.)

For all these reasons, the Court will grant Defendant Seidl's request for summary judgment on this claim.

### d.    Intentional Infliction of Emotional Distress

To establish a prima facie case of intentional infliction of emotional distress under Michigan law, a plaintiff must present evidence of: "(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh*, 263 Mich. App. at 634 (citation omitted). "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id*. (citation omitted).

40

In light of the facts examined above, the Court finds that Plaintiff has not evidenced that Defendant Seidl's conduct was so extreme to sustain this claim, nor has Plaintiff evidenced that Defendant Seidl acted in a malicious or premeditated manner. Additionally, the evidence in the present case indicates that Defendant Seidl had probable cause to seek Plaintiff's arrest and therefore, a claim of IIED cannot lie. *See id*. (holding that when the defendant had probable cause to seek an arrest, "as a matter of law he cannot be liable for intentional infliction of emotional distress.").

      e.    Gross Negligence

In *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011), the Sixth Circuit explained that a plaintiff's allegations of excessive and intentional force could not support a separate claim of gross negligence under Michigan law because they were "fully premised" on his claims of assault and battery and, therefore, "[t]he only cause of action available to plaintiff for allegations of this nature would be for assault and battery." *Bletz*, 641 F.3d at 756 (relying upon *Van Vorous v. Burmeister*, 262 Mich. App. 467, 483 (2004), *overruled in part on other grounds by Odum*, 482 Mich. 459). The Sixth Circuit reasoned that "[a]lthough establishing that a governmental official's conduct amounts to 'gross negligence' is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action." *Id.* Accordingly, when a court is faced with claims of gross negligence, it must look "beyond the procedural labels in the complaint and determine the exact nature of the claim.... Elements of intentional torts may not be transformed into gross negligence claims." *Norris v. Police Officers*, 808 N.W.2d 578,

41

584 (Mich. Ct. App. 2011).

Here, Plaintiff's allegation in support of its gross negligence claim is that Defendant Seidl "had a duty to perform [his] employment activities so as not to endanger or cause harm to Plaintiff." (Compl., at ¶ 38.) Plaintiff argues in his response that this represents a separate basis for his gross negligence claim "that does not rely on an intentional, offensive touching." (ECF No. 62, Pl.'s Resp. at 34.) Plaintiff then goes on to argue that Defendant Seidl "should have clearly foreseen that initiating and/or causing criminal charges to be pursued against Plaintiff when he lacked probable cause and/or had not even seriously considered exculpatory evidence exonerating Plaintiff, would result in injuries and damages to Plaintiff." (*Id.*)

Examining the true nature of Plaintiff's gross negligence claim reveals the claim is "fully premised" on his claims of false arrest and malicious prosecution – both intentional torts. Plaintiff's arguments regarding Defendant Seidl's employment duties relate exclusively to his failures to presume Plaintiff not guilty of a crime and bring criminal charges against Plaintiff without probable cause. (*See* ECF No. 62, Pl.'s Resp. at 33-34.) Accordingly, a separate claim of gross negligence will not lie. *Johnson ex rel. Steward v. Driggett*, No. 306560, 2013 WL 375701, at *7 (Mich. Ct. App. Jan. 31, 2013) (citing *Van Vorous*, 262 Mich. App. at 483, rejecting the plaintiff's attempt to "transform claims involving elements of intentional torts into claims of gross negligence."). The Court will grant Defendant Seidl's motion for summary judgment on this claim.

B.    City of Warren

For a municipality to be liable for a constitutional violation under § 1983, the violation must be a result of a policy or custom of the city. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978). "That is to say, the liability of counties and other local governments under § 1983 depends solely on whether the plaintiff's constitutional rights have been violated as a result of a 'policy' or 'custom' attributable to the county or local government." *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Generally, there are four paths a plaintiff may take to "prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency polices; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted).

Plaintiff claims that Defendant City of Warren is liable under § 1983 for failing to train or supervise its officers so as to prevent violations of Plaintiff's constitutional rights. (Compl. ¶¶ 45-48.) "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for the purposes of § 1983." *Connick v. Thompson*, --- U.S. ---, 131 S.Ct. 1350, 1358 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*. (citation omitted). Accordingly, the standard for such a finding is high: "[o]nly where a

43

municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming to be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).  For a municipality to be found liable under § 1983 for a failure to train its officers, a plaintiff must prove three elements: (1) "that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is a result of the [municipality's] deliberate indifference; and (3) that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (citation and internal quotation marks removed).

In support of his failure to train claim, Plaintiff notes that Defendant Seidl was not provided any formal training from the Defendant City of Warren regarding how to investigate a crime or how to determine whether probable cause existed to make an arrest. (Seidl Dep. at 52-54.)  Plaintiff further notes that former-defendant Dahlin never received any training regarding how to investigate crimes or gather information for an arrest warrant.  (Dahlin Dep. at 29-31.)

Regardless of whether Plaintiff can evidence that Defendant Seidl was inadequately trained by Defendant City of Warren regarding how to investigate a crime or the standards of probable cause, Plaintiff's failure to train claim still fails because Plaintiff cannot show the lack of training was due to Defendant City of Warren's deliberate indifference.  Indeed, Plaintiff does not suggest that the need for more training was obvious and likely to result in a constitutional violation.  *Connick*, 131 S.Ct. at 1361

44

(finding that in a "narrow range of circumstances" that the consequences of failing to train would be "so patently obvious" that a city could be liable without proof of a pre-existing pattern of violations.).  It is well established that the fact a particular officer is "unsatisfactorily trained will not alone suffice to fasten liability on the city."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390-91 (1989) (citation omitted); *see Miller v. Calhoun Cnty.*, 408 F.3d 803, 816 (6th Cir. 2005) ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability.") (citation omitted).  Rather, "[t]o show deliberate indifference, Plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."  *Plinton*, 540 F.3d at 464 (citation omitted).

Plaintiff did not offer any evidence that there were prior incidents that could have put Defendant City of Warren on notice of deficiencies in its training program, or indicate that Defendant City of Warren's failure to take action to correct its training policies was deliberate.  Finally, as Defendant Seidl testified that he understood the Fourth Amendment, and was aware of his obligations regarding turning over exculpatory evidence and his duty to be truthful in a warrant request, Plaintiff has failed to evidence that Defendant City of Warren's inadequate training "actually caused" his injury.  *Plinton*, 540 F.3d at 464.  Accordingly, the Court grants summary judgment on Plaintiff's claim for failure to train.

45

Plaintiff also argues that Defendant City of Warren failed to adequately supervise its officers as a basis for municipal liability.  "Similar to the failure-to-train inquiry outlined above, to sustain a failure-to-supervise claim, the plaintiff must show that the city acted with deliberate indifference to the rise of [the constitutional violation] and that its deliberate indifference was the moving force behind the [violation]."  *Amerson v. Waterford Twp*., 562 F. App'x 484, 492 (6th Cir. 2014) (citation and internal quotation marks omitted).  Plaintiff relies exclusively upon *Kammeyer v. City of Sharonville, Ohio*, No. 1:01-cv-00649, 2006 WL 1133241 (S.D. Ohio Apr. 27, 2006), to argue that Defendant City of Warren can be liable based on its failure to conduct performance evaluations or "review or monitor the officers' conduct."  (ECF No. 62, Pl.'s Resp. to Seidl/City of Warren Mot., at 31.)

Defendant Seidl testified that he only had one written performance evaluation during his employment with the City of Warren Police Office (Seidl Dep. at 50-51) and former defendant Dahlin testified that he also only received one performance evaluation. (Dahlin Dep. at 29.)  Defendant Seidl also testified that he had received performance evaluations during his field training process and had at least one meeting with a superior to go over his job performance.  (Seidl Dep. at 50.)  Further, Defendant Dahlin testified that supervisors reviewed his reports.  (Dahlin Dep. at 23-25.)

Regardless of the evidence supporting the fact that Defendant City of Warren did not routinely conduct performance evaluations, Plaintiff cannot sustain a failure to supervise theory of municipal liability based solely upon a lack of routine performance

evaluations.  First, Plaintiff's reliance upon *Kammeyer*, an unpublished Ohio District Court decision, is misplaced.  In *Kammeyer*, the district court found that questions of material fact existed regarding whether a municipality acted with deliberate indifference towards the supervision of its lead detective when it failed to conduct a performance evaluation of that detective for more than 32 years.  *Amerson*, 562 F. App'x at 492 (summarizing the evidence of *Kammeyer*).  However, in *Kammeyer*, there was evidence that the municipality was *on notice* of its need to supervise the lead detective because it had received letters regarding citizens' concerns over his actions and his the entire command staff reported their dissatisfaction with him.  *Id*.

In the instant case, Plaintiff only offers evidence that Defendant Seidl and former Defendant Dahlin did not receive regular performance evaluations.  The Sixth Circuit has held such evidence is not sufficient to show deliberate indifference in the "absence of evidence of a pattern" of similar constitutional violations or a record of officers going unpunished for the same conduct.  *Amerson*, 562 F. App'x at 492 (distinguishing *Kammeyer* and affirming summary judgment on a failure to supervise claim when the plaintiff only presented evidence of the municipality's failure to conduct performance evaluations).  Accordingly, the Court will grant Defendant City of Warren's motion for summary judgment on this claim.

## IV.CONCLUSION

For all these reasons, the Court will GRANT Defendants Seidl and City of Warren's Motion for Summary Judgment (ECF No. ) and DENY Plaintiff's Partial

47

Motion for Summary Judgment as to Defendant Seidl (ECF No. 62.)

     IT IS SO ORDERED.


                    s/Paul D. Borman
                    PAUL D. BORMAN
                    UNITED STATES DISTRICT JUDGE

Dated:  June 9, 2016

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 9, 2016.


                    s/Deborah Tofil
                    Case Manager