UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL ZAVATSON,

                Plaintiff,

                              Case No. 14-10623

vs.

                              Paul D. Borman
                              United States District Judge

MARC SONNENFELD, ET AL.,

                Defendants.

_____/

OPINION AND ORDER:
(1) GRANTING DEFENDANTS FITZGERALD PUBLIC SCHOOLS, FITZGERALD BOARD
OF EDUCATION, BARBARA VANSWEDEN, MELANIE RAINWATER, WENDY
HAGGERTY, MARK SONNENFELD, AND JOHN CANDELA'S
MOTION FOR SUMMARY JUDGMENT (ECF NO. 46);
(2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS IT PERTAINS TO
DEFENDANTS SONNENFELD AND CANDELA (ECF NO. 61); AND
(3) DENYING AS MOOT PLAINTIFF'S MOTION TO CERTIFY JUDGMENT (ECF NO. 68)

      In November 2012, money was reported stolen from two offices in Fitzgerald High

School.  Plaintiff Daniel Zavatson, a custodian at the high school, was the subject of an

investigation by both the Warren police and his employer regarding the alleged thefts.  While the

school investigation was inconclusive and he was allowed to return to work, the police

investigation resulted in the issuance of an arrest warrant for Plaintiff for two counts of larceny.

Plaintiff was eventually bound over on one count of larceny; that charge was later dismissed.

Subsequently, Plaintiff was terminated from his position as custodian by Defendants for

allegedly failing to report his felony arraignment as required by Michigan state law.  On

February 20, 2014, Plaintiff filed this action alleging a multitude of federal and state claims.

(ECF No. 1.)

Plaintiff moved for partial summary judgment against Defendants Donald Seidl, Marc Sonnenfeld, and John Candela.  (ECF No. 61.)[1]  Defendants Seidl and City of Warren also moved for summary judgment (the "Warren Defendants").[2]  (ECF No. 43.)  Finally, Defendants John Candela, Fitzgerald Public Schools, Fitzgerald Public School Board of Education, Wendy Hagerty,[3] Melanie Rainwater, Marc Sonnenfeld, and Barbara VanSweden (the "Fitzgerald Defendants") filed this motion for summary judgment.[4]  (ECF No. 46.)

This Court previously held a hearing on the Warren Defendants' motion for summary judgment and Plaintiff's partial motion for summary judgment only as it pertained to Defendant Seidl.  On June 9, 2016, the Court issued an Opinion and Order granting the Warren Defendants' motion for summary judgment and denying Plaintiff's partial motion for summary judgment as it pertained to Defendant Seidl.  *Zavatson v. City of Warren*, 14-10623, 2016 WL 3197398 (E.D. Mich., June 9, 2016) (available on the docket at ECF No. 66.)  Thereafter, Plaintiff filed a motion for certificate of appealability pursuant to Federal Rule of Civil Procedure 54(b).  (ECF No. 68.)  The Warren Defendants filed a response on July 21, 2016, and requested that the Court not address the motion until after the Fitzgerald Defendants' motion for summary judgment and Plaintiff's partial motion for summary judgment as it pertains to Defendants Sonnenfeld and

---

[1] Defendant Seidl responded to the motion (ECF No. 51) as did Defendants Sonnenfeld and Candela (ECF No. 54).  Plaintiff then filed his corresponding replies (ECF Nos. 57, 58).

[2] Plaintiff filed his response (ECF No. 62), and Defendants Seidl and City of Warren filed their reply (ECF No. 56).

[3] The Complaint in this action erroneously spells Wendy Hagerty's name as "Haggerty." It is clear from the exhibits in this action, however, that the correct spelling of her name is "Hagerty."

[4] Plaintiff filed his response (ECF No. 63) and the Fitzgerald Defendants filed their reply (ECF No. 59).

2

Candela were resolved by the Court.  Plaintiff thereafter filed a reply. (ECF No. 72 .)

 A hearing on the Fitzgerald Defendants' motion for summary judgment and Plaintiff's partial motion for summary judgment as it pertains to Defendants Candela and Sonnenfeld was held on August 16, 2016.  For the reasons set forth below, the Court will grant the Fitzgerald Defendants' motion for summary judgment, deny Plaintiff's partial motion for summary judgment as it pertains to Defendants Sonnenfeld and Candela, and deny as moot Plaintiff's motion for certificate of appealability.

## II. BACKGROUND

### A.    Alleged Theft, Police Investigation and State Court Proceedings

The Court previously set forth the background facts regarding the alleged thefts, the police investigation, and the state court proceedings in *Zavatson v. City of Warren*, No. 14-10623, 2016 WL 3197398, at *1-7 (E.D. Mich. June 9, 2016).  The Court incorporates those facts here.

Briefly, on November 27, 2012, Defendant Marc Sonnenfeld, the Athletic Director and Dean of Discipline for Fitzgerald high School, called the Warren Police Department to report that approximately $510.00 was stolen from a safe in his office over the Thanksgiving holiday break.  (*See* Compl. ¶ 22; ECF No. 61, Pl.'s Mot., Ex. E, Sonnenfeld Dep. Vol. II, at 26; Ex. W, Police Report at 7.)  Defendant Sonnenfeld kept his key to the safe in a desk drawer, and the combination to the safe was written down on a piece of paper kept in a different drawer concealed under a tray in his office.  (Sonnenfeld Dep., Vol. I, at 59-60, 70.)  On or about November 27, 2012, Defendant Sonnenfeld requested that his secretary bring in her extra key to the safe because he could not locate his key. (Sonnenfeld Dep. Vol. II, at 44; Fitzgerald Mot.,

3

Ex. 4, 11/27/12 Email)  Upon opening the safe, Defendant Sonnenfeld found the cash box he

used to make change for sporting events was empty and rolls of quarters were missing.

(Sonnenfeld Dep. Vol. II, at 44.)  Defendant Sonnenfeld had most recently opened the safe on

the Monday prior to November 20, 2012. (Sonnenfeld Dep. Vol. I, at 92-94.)

Upon discovering the money missing, Defendant Sonnenfeld went across the hall to

Defendant Candela's office (known as the business office) to request money to make change for

the next sporting event.  (Fitzgerald Defs.' Mot., Ex. 6, Candela Dep., at 39-40.)  Defendant

Candela, a district accountant, kept $500.00 in petty cash in a strong box in a safe in a room

separate but connected to his office.  (*Id*., at 7, 17-18, 25-26.)  Both Defendant Candela and his

secretary had keys to the safe and the strong box, and Defendant Candela kept his keys in

different unlocked cabinet drawers in his office.  (*Id*., at 22-23, 24.)

Upon opening his strong box on or about November 27, 2012, Defendant Candela

discovered that approximately $260.00 was missing from the box and that there were no receipts

to evidence who took the money or for what purpose it was taken.  (*Id*., at 29-32.)  This was the

first time Defendant Candela had opened his safe since June 2012.  (*Id*.)  Defendant Candela

notified the CFO of the district of the money missing from his safe.  (*Id*.)

Gary Skop, a security employee at the school, was directed by either Defendant

Sonnenfeld or Carl Schultz, principal of Fitzgerald High School, to review video surveillance of

the time period prior to the Thanksgiving break.[5]  (Ex. 9, Skop Dep., at 17-19.)  In reviewing the

video footage from the security cameras in the second floor A-Hall, Skop discovered footage of

---

[5] Carl Schultz was a named defendant in this action but was dismissed pursuant to a
stipulated order on October 8, 2015.  (ECF No. 49).

4

a figure walking down the A-Hall and entering Defendant Sonnenfeld's office at 10:27 p.m. and exiting the office at 10:34 p.m on November 20, 2012.  (Skop Dep., at 34-35.)  Skop also saw video footage in that time period of a shadow or shadowy figure leave the custodian break room and enter the cafeteria.  (Skop Dep., at 49-51; Ex. L, Preliminary Exam., at 63-64.)  Skop was unable to track the figure upon entry to the cafeteria because it was too dark and the camera did not register any movement.  (Skop Dep., at 49-50, Preliminary Exam., at 64-65.)  Skop did not recall ever telling anyone from the City of Warren that he had seen the figure go from the cafeteria to the kitchen and then to the A-wing.  (Skop Dep., at 51.)  Skop also only exported or saved the "clips," or small portions of video, that showed movement because he was unable to export all the videos off the file server because of its size.  (*Id.*, at 45-46.)  Skop testified that he did not edit the surveillance clips, but just saved pertinent portions that registered motion.  (*Id.*)

Former-defendant Warren Police Officer John Dahlin initially responded to Defendant Sonnenfeld's report of the theft and interviewed Defendant Sonnenfeld on November 28, 2012.[6] (ECF No. 61, Pl.'s Mot., Ex. C, Dahlin Dep., at 14-18; Police Report at 7.)  Defendant Sonnenfeld informed Officer Dahlin that he believed one of the custodians, Plaintiff Daniel Zavatson, was responsible for the theft.  (*Id.*; Sonnenfeld Dep. Vol. II, at 47.)  Defendant Sonnenfeld explained that he had reviewed surveillance footage from November 20, 2012 and determined that there were only five custodians working that night and he was able to find four of the five custodians, actually working, on the video and could identify them through the footage.  (Sonnenfeld Dep. at 46-49; Police Report at 7.)  Defendant Sonnenfeld also informed

---

[6] Officer John Dahlin was originally a named defendant in this action but was dismissed pursuant to a stipulation.  (ECF No. 40.)

Officer Dahlin that Plaintiff was assigned to clean offices and hallways in the A-Hall and had keys to the Athletic Office and the desk where the key to the safe was kept. (*Id*. at 7-8.) Finally, Defendant Sonnenfeld reported that unknown amounts of money were possibly missing from the business department and from a teacher's desk in the same area as the Athletic Office – where Plaintiff is assigned to clean. (Police Report, at 8.) Officer Dahlin also watched the video surveillance of the figure and noted that he could "see the suspect enter the hallway from the stairs, moved over to the south side of the hallway heading west, to the Athletic Department Office and entered the locked room. The suspect was in the office for approximately 5 min and then was observed leaving, taking the same route back to the stairs." (*Id*., at 7.) Officer Dahlin described the figure as "male, wearing a heavy coat, and skinny legs." (*Id*.)

On November 28, 2012, the case was transferred to Defendant Warren Police Officer Donald Seidl. (Police Report, at 8.) Defendant Seidl thereafter met with Principal Schultz and reviewed the video surveillance clips from November 20, 2012. (*Id*.) Principal Schultz advised Defendant Seidl that two male custodians worked that night, Michael McConnell and Plaintiff. (*Id*.) Defendant Seidl noted in the Police Report that at the time of the allege theft, McConnell is seen on camera in a different part of the building, while the video shows Plaintiff entering the break room prior to the alleged theft and seen exiting the break room after the alleged theft. (*Id*., at 9.) Defendant Seidl observed there was no video from inside the break room. (*Id*.)

Defendant Seidl ultimately interviewed all of the custodians working that night, including Plaintiff who denied he committed any theft and could not remember if he had cleaned the Athletic Office on November 20, 2012. (Police Report, 10-11, 12-13; ECF No. 61, Pl.'s Mot., Ex. B, Seidl Dep., 82-32.) Following his interview, Plaintiff indicated through his attorney he

6

wished to take a polygraph test which was then scheduled for February 20, 2013. (Police Report, at 13; Seidl Dep. at 89-90, 158.) Defendant Seidl also visited the custodian break room on December 3, 2012 to ascertain whether there was a second access door. (Police Report, at 10-11; Seidl Dep. at 91.) Defendant Seidl confirmed there was a second access door to the break room and also noted that a blue hooded jacket, that matched the description of the jacket worn by the suspect seen on the video surveillance, was hanging on a coatrack in the break room. (*Id.*) Defendant Rainwater, Plaintiff's supervisor, advised Defendant Seidl that "if not wanting to be seen, [a person] would have exited the break room through the print room [the second access door], cut through the cafeteria, then up the stairs because that route is the darkest and the furthest from the surveillance cameras." (Police Report, at 11.)

In furtherance of his investigation, Defendant Seidl met with Skop again to review the video surveillance and also set about attempting to determine the height of the figure captured on the November 20, 2012 video surveillance. (*Id.*, at 12; *see also* ECF No. 61, Pl.'s Mot., Ex. T, Video Surveillance.) To that end, Defendant Seidl arranged for teachers to walk down the hallways captured on the pertinent surveillance video. Defendant Seidl then compared the height of these teachers on the video (or still photographs of the video) to the height of the unidentified figure taken from the same camera in the same hallway on November 20, 2012. (Seidl Dep. at 69-70; 91; Police Report at 13.) From the results of the comparison, Defendant Seidl concluded the figure in the video clip was approximately 5'10". (*Id.*) This conclusion, coupled with the thin build of the figure, led Defendant Seidl to eliminate all of the female custodians as suspects. (*Id.*) Defendant Seidl also eliminated McConnell as a suspect because he was seen working in a different hall at the same time the suspect figure was recorded going into the Athletic Director's

7

office.  (Police Report, at 13.)  Plaintiff was not eliminated as a suspect by Defendant Seidl's height comparison test.

On January 18, 2013, Defendant Seidl interviewed Defendants Sonnenfeld and Candela. At that time, almost two months after the theft was reported, Defendant Seidl directed a Warren evidence technician to take pictures of both offices, the safes, and the location of the cabinets in each office where the keys were located.  (Police Report at 14.)  Defendant Candela reported at that time that he had previously discovered money from his office was missing.  (*Id*.)

That same day, Defendant Seidl submitted an arrest warrant request against Plaintiff which was presented to Assistant Macomb County Prosecutor Heather Odgers.  (Seidl Dep. at 103-07.)  The warrant request included Defendant Seidl's complete police report, Defendant Candela's witness statement, a video DVD of the surveillance video clips from November 20, 2012, the video Defendant Seidl created to compare heights, photographs of the business and athletic director offices, and copies of the drivers licenses of the teachers used in the height comparison.  (Seidl Dep. at 103-16.)  Defendant Seidl also testified that he spoke with Prosecutor Odgers and informed her that he could not identify the figure in the video surveillance footage from November 20, 2012 because "you can't see his face, but there was evidence to believe that Daniel Zavatson was that individual."  (*Id*. at 62:21-24, 63.)

On January 22, 2013, Prosecutor Odgers authorized the warrant for two counts of larceny against Plaintiff.  (Police Report, at 14.)  Then, on March 4, 2013, a preliminary examination was held before Judge Jennifer Faunce, in the 37th Judicial District Court for the County of Macomb.  (ECF No. 61, Pl.'s Mot., Ex. M, Prelim. Exam Hrg. Trans.)  The prosecution called four witnesses to support its case: Gary Skop, Defendant Seidl, Defendant Sonnenfeld, and

8

Defendant Candela.  (*Id*.)  Judge Faunce dismissed the second count of larceny based on the alleged theft from the Business office but bound over Plaintiff on the first count of larceny based on the alleged theft from the Athletic Director's office.  (*Id*. at 110-11.)

On March 6, 2013, approximately four months after the theft allegedly occurred, Defendant Seidl requested that the safe that was in Athletic Director's office on November 20, 2012 be fingerprinted.[7]  (Seidl Dep. at 92-97, 133-37.)

On May 28, 2013, Plaintiff's attorney filed a motion to quash which was heard by visiting Judge Thomas W. Brookover.  (Ex. N, Motion to Quash Hrg. Trans.)  Plaintiff's counsel argued that the video established Plaintiff was in the break room during the time that the unidentified figure is seen entering the Athletic Director's office.  (*Id*. at 5.)  Plaintiff's attorney also presented the court with new evidence that Plaintiff had recently passed a polygraph test. (*Id*. at 6.)  Judge Brookover granted the motion to quash.  (*Id*. at 7.)

B.      School Investigation

On December 4, 2012, Defendant Barbara VanSweden, Superintendent of Fitzgerald Schools, requested that Defendant Wendy Hagerty, the school district's Human Resource Manager, conduct an internal investigation into the missing money on behalf of the School District.  (ECF No. 46, Fitzgerald Mot., Ex. 8, 1/18/2013, Hagerty Memo; ECF No. 63, Pl.'s Resp. to Fitzgerald Mot., Ex. G, VanSweden Dep., at 28.)

Defendant Hagerty was informed by Defendant VanSweden that there had been a theft from the Athletic Director's office on November 20, 2012, there was pertinent video surveillance

---

[7] In July 2013, after the criminal proceeding against Plaintiff was dismissed, Defendant Seidl received a report concluding that the prints collected from the safe in Defendant Sonnenfeld's office did not match Plaintiff's fingerprints.  (Seidl Dep., at 118, 120.)

evidence, the "prime suspect" was Plaintiff, and the Warren police was involved.  (Hagerty Memo, at 1.)  Defendant Hagerty did not have any contact with the police during her internal investigation, although she did request the results of the police report in March, 2013.  (Pl.'s Resp. to Fitzgerald Mot., Ex. H, Hagerty Dep., at 22-23.)  During her investigation, Defendant Hagerty spoke with Defendant Sonnenfeld and reviewed the video footage from November 20, 2012 that was collected by Gary Skop, a security employee at the school.  (Hagerty Memo, at 2.)  After reviewing the video footage "over and over on several different days with the assistance of Rainwater," Defendant Hagerty created a time-line of events.  (*Id*. at 3.)  She noted in her time-line that Plaintiff was seen entering the break room at 10:10 p.m. and parenthetically questioned whether he stayed in the room.  (*Id*., noting "10:10 Zavatson enters first floor D wing break room (*Does he stay?*)).  She also noted that "a figure in dark coat walks up the back stairs in A Wing. (*Comes from where?*)," and that the figure entered the Athletic Office at 10:27 p.m., exited at 10:33 p.m., and then walked down the A-Hall to an unknown destination.  (*Id*.).  Finally, Defendant Hagerty noted in her time-line that at "10:36 Door of first floor D wing break room opens no one exits.  Door is open for 20 seconds then Zavatson leaves D wing break room. (*Who else was in there? Was he in there the whole 26 minutes straight through?*)"  (*Id*.).  Defendant Hagerty also interviewed three other custodians, Connie Asocar, Linda Rigney, and Michael McConnell, none of whom could remember any details from the night of November 20, 2013.  (*Id*. at 2.)

   Also pertinent to Defendant Hagerty's investigation was the fact that the cameras outside the school were not functional and some of the internal cameras were not working that night.  (*Id*.)  Defendant Hagerty further noted that there were other events occurring at the school that

night including a choir concert, basketball practices, and swim practice.  (Hagerty Memo, at 2.)

She concluded that more video footage was necessary for her investigation, specifically "the

interior video footage of the first floor D wing and second floor A wing on November 20, 2012

continuously from 9:00 p.m. until 11:00 p.m. as well as exterior camera video." (*Id*.)  Defendant

Hagerty observed that no one alerted the Technology Contractor to preserve all the footage, so

all of the footage would have been overwritten by November 30, 2012.  (Hagerty Memo, at 2.)

In furtherance of the school investigation, Defendant Hagerty and Defendant Melanie

Rainwater interviewed Plaintiff in the presence of his union representative.  During that

interview, Plaintiff denied stealing anything and claimed that other custodians were in the break

room with him that night.  (*Id*. at 3.)  Defendant Hagerty and Defendant Rainwater also reviewed

the pertinent video footage of the figure from November 20, 2012 with footage of Plaintiff

walking into and out of the office where his interview was held.  (*Id*.)  They could not confirm

"100%" based on their comparison whether the figure seen going into the Athletic Office on

November 20, 2012 was Plaintiff based on that comparison.  (*Id*.)  Ultimately, Defendant

Hagerty's investigation was "inconclusive" and provided that Plaintiff would be directed to

return to work on January 22, 2013.   (*Id*.)  Defendant Hagerty also noted that the District

reserved the right to re-open the investigation if new information was obtained.  (Hagerty Memo,

at 3.)

C.      Employment Suspensions, Hearings, and Termination

Plaintiff and two of his union representatives met with Defendant Rainwater and

Defendant Hagerty on December 4, 2012 regarding the investigation of missing funds from the

Athletic Director's Office.  (ECF No. 46, Fitzgerald Mot., Ex. 10, December 6, 2012 Letter.)

11

Plaintiff was informed at that meeting that he was being placed on paid leave and would be contacted regarding an interview.  (ECF No. 62, Pl.'s Resp. to Seidl/City of Warren Mot., Ex. A, Zavatson Dep. at 58, 65-66.)

On January 21, 2013, Plaintiff was notified by letter that the school's investigation was inconclusive and he was directed to return to work on Tuesday, January 22, 2013.  (ECF No. 46, Fitzgerald Mot., Ex. 11, January 18, 2013 Letter.)  Plaintiff, however, did not report to work on January 22, 2013, because he was advised by Defendant police officer Seidl that a felony arrest warrant had issued against him, and that he should turn himself in to the police on January 24, 2013.  (Zavatson Dep. at 67-69.)  Plaintiff called the school's absence line and reported that he was ill and would not be coming in to work on January 22, 2013.  (*Id*. at 71-72.)  Thereafter, Plaintiff went on leave pursuant to the Family Medical Leave Act.  (ECF No. 46, Fitzgerald Mot., Ex. 12, FMLA Notice.)

Plaintiff never notified anyone at Fitzgerald Public Schools of his felony arraignment.  (Zavataion Dep. at 76-77.)  Plaintiff testified that he was unaware of a Michigan state law that required he report a felony arraignment.  (*Id*. at 94-96.)  Plaintiff also admitted that he had no reason to believe that he did not receive emails from his employer that included information regarding the mandatory reporting law; Plaintiff just did not read those particular emails.  (*Id*. at 94-98.)

On March 5, 2013, Plaintiff was on his way to report for work when he was summoned for a meeting in Defendant Rainwater's office.  (*Id*. at 77.)  At that meeting he was handed a letter from Defendant Hagerty informing him that he was being placed on an unpaid suspension based on the District's belief that he had failed to report his felony arraignment in violation of

Michigan state law.  (*Id.* 77-78; ECF No. 46, Fitzgerald Mot., Ex. 16, March 5, 2013 Letter.)

Plaintiff filed a grievance two days later with his union regarding that unpaid suspension. (ECF No. 46, Fitzgerald Mot., Ex. 17, March 7, 2013 Grievance; Zavatson Dep. at 79.)  On May 2, 2013, a grievance meeting was held regarding Plaintiff's unpaid suspension and Plaintiff attended that meeting with his union representative.  (Zavatson Dep. at 79.)  Plaintiff admitted that he did not offer any evidence that he had complied with the state reporting requirement at that meeting.  (*Id.* at 80.)  Defendant Hagerty denied Plaintiff's grievance, finding that Plaintiff had failed to evidence that he had complied with State law by reporting his felony arraignment. (ECF No. 46, Fitzgerald Mot., Ex. 18, May 24, 2013, Grievance Response.)

By a letter dated June 7, 2013, Plaintiff was notified by Defendant VanSweden that the District had completed its review and concluded that Plaintiff had "failed to properly advise the District of [his] arraignment on felony charges as required under [Mich. Comp. Laws § 380.1230d]."  (ECF No. 46, Fitzgerald Mot., Ex. 19, June 7, 2013 Letter.)  Plaintiff was advised that a hearing on the issue would be held on June 13, 2013 before the Board of Education and Plaintiff was invited to "provide evidence that [he] did in fact comply with these statutory requirements."  (*Id.*)

On June 13, 2013, the Board of Education held a closed door meeting as scheduled. (ECF No. 46, Fitzgerald Mot., Ex. 20, June 13, 2013, Minutes of Special Board of Education Meeting.)  Plaintiff attended this hearing with his attorney and union representatives.  (Zavatson Dep. at 81-82.)  After the meeting, through the city attorney, Plaintiff was offered his position with no back pay in return for an agreement not to sue the District.  (Zavatson Dep. at 83.) Plaintiff declined the offer.  (*Id.* at 86.)

On June 20, 2013, the Board of Education held a second meeting and voted to terminate Plaintiff.  (ECF No. 46, Fitzgerald Mot., Ex. 21, June 20, 2013, Minutes of Regular Board of Education Meeting; Ex. 22, June 21, 2013 Letter regarding Termination.)  Plaintiff was aware of this meeting, but he chose not to attend.  (*Id*. at 87.)

On December 9, 2013, Defendant VanSweden denied Plaintiff's grievance at the Step III level because Plaintiff "failed to comply with statute MCL 380.1230d and was thereafter discharged by the Board of Education."  (ECF No. 46, Fitzgerald Mot., Ex. 23, December 9, 2013 Grievance Response; Zavatson Dep. 114-15.)

### III. STANDARD OF REVIEW

The Fitzgerald Defendants have moved for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure on all the claims asserted against them.  Plaintiff has also moved for summary judgment but only as to certain claims asserted against Defendants Candela and Sonnenfeld.

Rule 56 provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

14

absence of genuine issue of material fact." *Id.* at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987). In making this evaluation, however, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## IV. ANALYSIS

A.     Defendants Sonnenfeld and Candela

Both Plaintiff and Defendants Sonnenfeld and Candela moved for summary judgment on Plaintiff's federal and state law claims of false arrest and malicious prosecution. Defendants Sonnenfeld and Candela also moved for summary judgment on the remainder of the claims asserted against them.

1.     42 U.S.C. § 1983

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by

the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 47 (1988) (citation omitted). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised the power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state.'" *Id*. at 49 (citation omitted). The Supreme Court has explained:

> To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the States ... or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." "[S]tate employment is generally sufficient to render the defendant a state actor." It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.

*Id.* at 49 (internal citations omitted). In the instant action, Plaintiff alleged that Defendants Candela and Sonnenfeld violated his right to be free from an illegal seizure and malicious prosecution pursuant to the Fourth Amendment and made applicable to the States through the Fourteenth Amendment.

    a.    Illegal Seizure Claims

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) (citation omitted). Put another way, "a law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime." *Williams ex rel. Allen v. Cambridge Bd. of Educ*., 370 F.3d 630, 636 (6th Cir. 2004) (citation omitted). Probable cause is a defense to a

16

claim of false arrest. *Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988).

Defendants Candela and Sonnenfeld argue that Plaintiff's federal claim of illegal seizure fails because reporting a crime is an "individual exercise of the right and privilege allowed by state law" and "d[id] not render their action in doing so 'state action' for purposes of the constitutional violation alleged." (ECF No. 46, Fitzgerald Defs.' Mot. at 16.) Plaintiff, on the other hand, argues that Defendants Candela and Sonnenfeld's actions constitute "state action" because these Defendants were public school officials who, during the course of their job, reported to the police a theft of school funds from the school.

In support of the argument that they were not "state actors," Defendants Candela and Sonnenfeld rely upon case law examining whether the actions of off-duty police officers constituted state action for purposes of a § 1983 action. *Revene v. Charles Cnty. Com'rs*., 882 F.2d 870, 872 (6th Cir. 1989); *see also Redding v. St. Eward*, 241 F.3d 530 (6th Cir. 2001). Generally, however, state employment is sufficient to render a person a state actor. *West*, 487 at 49. Further, Defendants Candela and Sonnenfeld's pertinent actions were the discovery of missing public school funds from their offices during the course of Defendants' employment with the school and the subsequent reporting of missing school funds to the police. Accordingly, cases evaluating off-duty police officers' actions or the actions of private parties (who were not state employees) are factually distinguishable from the present action where Defendants Candela and Sonnenfeld were state employees who discovered and reported the theft of school funds while at work. Given these facts, the Court concludes that there is at least a genuine issue of material fact regarding whether Defendants Candela and Sonnenfeld were "acting under the color of state law" when they reported school money missing from their offices.

17

Assuming Defendants Candela and Sonnenfeld were state actors, however, Defendants Candela and Sonnenfeld's motion for summary judgment on Plaintiff's §1983 claim for false arrest must still be granted.  "Section 1983 makes liable only those who, while acting under color of state law, deprive another of a right secured by the Constitution or federal law." *Romanski v. Detroit Ent., LLC*, 428 F.3d 629, 636 (6th Cir. 2005) (citing 42 U.S.C. § 1983).  Here, Plaintiff alleged in his complaint that Defendant Candela and Sonnenfeld, as well as Defendant Warren Police Officer Seidl:

> acted under color of law and unreasonably when they violated Plaintiff's Fourth Amendment rights when **they falsely arrested and falsely detained** Plaintiff without probable cause or exigent circumstances.

> Defendants acted unreasonably and failed in their duties when they **falsely arrested/detained/seized** Plaintiff without considering the totality of the circumstances.

(Compl. ¶¶ 59, 60 (emphasis added)).  Yet, in this action, Defendants Candela and Sonnenfeld very obviously did not seize, arrest, or otherwise detain Plaintiff, and there is no evidence in this record upon which a juror could conclude otherwise.  (*See* Zavatson Dep., at 51-56, testifying that neither Defendant Candela nor Defendant Sonnenfeld detained or restrained him in any way.)

Plaintiff contends that Defendants Candela and Sonnenfeld are liable for false arrest pursuant to § 1983 based upon their instigation of his arrest by falsely reporting the alleged thefts to the police.  The dearth of any analogous case law, however, undermines Plaintiff's argument.  Other cases indicate that active participation by a state actor in the arrest or seizure is a predicate for liability pursuant to § 1983.  In *Webb v. United States*, 789 F.3d 647, 667 (6th Cir. 2015) the Sixth Circuit affirmed the dismissal of federal false arrest claims against law-

enforcement defendants where those defendants were not active participants in the false arrest and did not "implicitly authorize" their subordinates to falsely arrest the plaintiff.  *See also Morris v. Boyd*, 39 F. App'x 281, 283 (6th Cir. 2002) (finding that the plaintiff had failed to establish any federal claims pursuant to § 1983 (including false arrest) against a defendant detective when the plaintiff had only alleged that the defendant "was a lieutenant and an investigating officer at the time, that he received call from the deputy warden, and that he received false information from a prison official, not that [the defendant] was personally involved in the deprivation of [plaintiff's] rights, as required for a § 1983 action."  The plaintiff also did not allege facts that could support supervisory liability under § 1983.)  Thus, Defendants Candela and Sonnenfeld, as state actors, cannot be found liable for Defendant Seidl's allegedly false arrest of Plaintiff, when Plaintiff has failed to evidence that they actively participated in the arrest or seizure of Plaintiff.

In the alternative, Plaintiff appears to assert that Defendants Candela and Sonnenfeld could also be liable for false arrest pursuant to § 1983 as private persons who were jointly engaged with state officials in a prohibited action.  (*See* ECF No. 58, Pl.'s Reply, at 3.) Critically, however, Plaintiff did not set forth any evidence that Defendants Candela and Sonnenfeld acted in concert with any state actor and Plaintiff did not plead any conspiracy or joint action with state actors in his complaint.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 996-97 (6th Cir. 1999) (citation omitted, alterations in *McPherson*).  Further, even assuming Defendants Candela and

Sonnenfeld were private actors when they reported the alleged thefts of school money, the Sixth Circuit has held that "[p]roviding information to the police, responding to the questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under state law.'"  *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009) (citing with approval *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983) ("We know of no case in which the report of a state crime is action under color of state law under § 1983.  The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under §§ 1983 or 1985.")). Accordingly, the Court rejects any attempt by Plaintiff to assert a false arrest claim pursuant to § 1983 against Defendants Candela and Sonnenfeld based upon their joint activity or conspiracy with state actors, because that claim is not properly before this Court.

Finally, Plaintiff also moves for summary judgment on the federal false arrest claims against Defendants Candela and Sonnenfeld, but Plaintiff fails to differentiate between Defendants Candela and Sonnenfeld's conduct and the actions of Defendant Warren Police Officer Seidl.  (ECF No. 61, Pl.'s Mot., at 20.)  Indeed, Plaintiff did not substantively address the federal false arrest claim against Defendants Sonnenfeld and Candela beyond a single conclusory sentence: "It is further clear that Defendants Sonnenfeld and Candela also did not have one shred of evidence to believe that Plaintiff was responsible for any theft was allegedly [sic] had even taken place, yet they accused him of same."  (*Id*.)  Accordingly, Plaintiff's motion for summary judgment on these claims must be denied when he did not carry his burden in showing no issue of material fact existed as to the federal false arrest claims.

20

In summary, while there may be an issue of material fact regarding whether Defendants Candela and Sonnenfeld acted under the color of state law at the time they reported the thefts from Fitzgerald High School, even assuming Defendants Candela and Sonnenfeld were state actors, Plaintiff's federal false arrest claims fail as a matter of law where Defendants Candela and Sonnenfeld did not illegally seize, detain, or participate in the false arrest of Plaintiff. The Court will therefore grant Defendants' motion for summary judgment and deny Plaintiff's request for summary judgment on these claims.

b.    Malicious Prosecution

To establish a Fourth Amendment malicious prosecution claim pursuant to § 1983,

> a plaintiff must prove the following: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014) (citation omitted); *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010).

Defendants Candela and Sonnenfeld first argue that Plaintiff's federal claim of malicious prosecution should fail because Plaintiff could not show that they were "acting under the color of state law." As discussed *supra*, the Court finds that a genuine issue of material fact exists on the issue of whether Defendant Candela and Sonnenfeld were acting under the color of state law at the time they reported the alleged thefts.

Defendants Candela and Sonnenfeld also argue Plaintiff's federal malicious prosecution claims must be dismissed because Plaintiff was not "detained" and did not suffer a "deprivation of liberty" because he turned himself in to the Warren police and was released on bond after his

21

preliminary exam.  (ECF No. 46, Fitzgerald Defs.' Mot., at 24-25.)  The issue of whether pretrial

conditions of release constitute "seizures" for purposes of the Fourth Amendment, however, is

unsettled in this Circuit.  *See Fisher v. Dodson*, 451 F. App'x 500, 502 (6th Cir. 2011); *Bray v.*

*Ohio Dept. of Nat. Res*., No. 2:14-cv-255, 2015 WL 1247012 (S.D. Ohio, Mar. 18, 2015).

Traditionally, federal malicious prosecutions claims are raised by "defendants who are detained

prior to trial."  *Fisher*, 451 F. App'x at 502.  Justice Ginsburg, however, suggested in her

concurrence in *Albright v. Oliver*, 510 U.S. 266, 279 (1994), that prosecution, even without

detention, can constitute a seizure under the Fourth Amendment because the defendant is bound

to appear in court and must remain in the jurisdiction of the court during the pendency of the

action.  *Id*.  The Sixth Circuit has characterized this concept as the "continuing seizure doctrine"

but has neither accepted nor rejected the doctrine.  *See Johnson v. City of Cincinnati*, 310 F.3d

484, 492 (6th Cir. 2002) (comparing other Circuits' treatment of the issue).  However, the

Second, Third, and Fifth Circuits have found that pretrial conditions of release do constitute

seizures for purposes of the Fourth Amendment.  *See Bray*, No. 2:14-cv-255, 2015 WL 1247012,

at *4 (collecting cases).  In the present case, Plaintiff was arraigned and posted a $50,000 bond.

In light of *Johnson* and *Bray*, the Court finds that there is at least a genuine issue of material fact

regarding whether Plaintiff was "detained" in the context of a Fourth Amendment malicious

prosecution claim.

Defendants Candela and Sonnenfeld next argue that Plaintiff's malicious prosecution

claim must be dismissed because there is no evidence that they made, influenced, or participated

in the decision to prosecute Plaintiff.  This argument is persuasive.  Plaintiff claims that

Defendants Candela and Sonnenfeld can be liable for a federal claim of malicious prosecution

22

because "they were the mechanisms by which the entire situation against Plaintiff was conceived, because they accused Plaintiff of stealing money despite having no evidence to support [the] same." (ECF No. 58, Pl.'s Reply, at 4.) Significantly, despite moving for summary judgment on these claims, Plaintiff neither cited any a single analogous decision, nor provided any reasoning to support the argument that complaining witnesses may be liable pursuant to § 1983 for malicious prosecution.

Plaintiff does not allege that either Defendant Sonnenfeld or Candela testified falsely during the preliminary exam. It is also undisputed that both Defendant Candela and Sonnenfeld reported money had been stolen from their safes because they had discovered money missing from their locked safes. While Defendant Sonnenfeld informed Defendant Warren Police Officer Seidl of his belief that Plaintiff may have committed the crimes, Defendant Candela never mentioned Plaintiff's name as a possible suspect to the police. Additionally, despite Plaintiff's repeated claims otherwise, there is no evidence that supports an inference that either Defendant Candela or Sonnenfeld knowingly made false statements regarding the thefts to Defendant Seidl or former-defendant Dahlin. Plaintiff claims that Defendant Sonnenfeld had "no evidence" to support his belief that Plaintiff had stolen the money from his office, however, Defendant Sonnenfeld testified that there were a variety of factors supporting his belief that Plaintiff may have committed the theft including: the video surveillance of an unknown figure gaining entry to the Athletic office; Plaintiff's access to his office, Plaintiff assignment to work in that area, and the fact Plaintiff was working the night the unknown figure was seen going into the Athletic office. Defendant Sonnenfeld also believed the fact that money was missing from Defendant Candela's office, also located in Plaintiff's work area, supported his belief that

Plaintiff could be a suspect.  (*See* Sonnenfeld Dep. Vol. II, at 34-36, 44.)

Defendant Candela merely reported money missing from the safe in his office as stolen to the police, and cooperated with the police investigation thereafter.  Defendant Sonnenfeld similarly reported money missing from the safe in his office as stolen and also advised the Warren police of his belief that Plaintiff may have committed the crime.  Critically, Plaintiff has failed to evidence that Defendant Sonnenfeld or Defendant Candela were involved in Defendant Seidl's ultimate request for an arrest warrant from the prosecutor, or were involved in the prosecutor's decision to prosecute Plaintiff for larceny.  *See e.g.*, *Jorg v. City of Cincinnati*, 145 F. App'x 143, 148-49 (6th Cir. 2005) (finding that city council members who publicly urged for an investigation in to a person's death could not be held liable for malicious prosecution when they did not participate in the decision to prosecute the plaintiff).  Indeed, Defendant Sonnenfeld did not know that Plaintiff had been charged with a crime until after the preliminary examination.  (Sonnenfeld Dep. Vol. II, at 54-56.)  As such, Plaintiff's claims for malicious prosecution fail because Plaintiff has not provided any evidence that Defendants Candela and Sonnenfeld made, influenced, or participated in the decision to prosecute him – a decision far removed from their report of the crimes.

Finally, the Court previously held Defendant Seidl had probable cause to seek an arrest warrant for Plaintiff and to commence prosecution.  *Zavatson*, 14-cv-10623, 2016 WL 3197398, *10, 13.  The Court's conclusion that probable cause existed at the time Defendant Seidl sought an arrest warrant and at the time prosecution was commenced also bars Plaintiff's federal malicious prosecution claims against Defendants Sonnenfeld and Candela.  *See Lucas*, 753 F.3d at 616 (recognizing that a plaintiff must show that there was no probable cause for the criminal

prosecution.)

For these reasons, the Court will grant Defendants' motion for summary judgment on this claim and deny Plaintiff's motion for summary judgment on the same.

    2.      State Law Claims

        a.      Malicious Prosecution

Plaintiff also pleaded state law claims of malicious prosecution against Defendants Sonnenfeld and Candela.  In Michigan, because a warrant may not be issued without a prosecutor's written authorization, "the prosecutor's exercise of his [or her] independent discretion in initiating and maintaining a prosecution is a complete defense to an action for malicious prosecution."  *Matthews v. Blue Cross and Blue Shield of Mich.*, 456 Mich. 365, 384 (1998); *see also Sykes*, 625 F.3d at 314 n. 13 (holding "'under Michigan law ... a criminal prosecution 'is initiated in the sole discretion of the prosecutor.'" (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 400 (6th Cir. 2009); *see also* MICH. COMP. LAWS § 764.1(1)).  There is a recognized exception to this rule, however, when "the information furnished was known by the giver to be false and *was the information on which the prosecutor acted*."  *Matthews*, 456 Mich. at 384 (emphasis in original).

Plaintiff argues that this exception applies in the present case because Defendants Sonnenfeld and Candela knowingly supplied false information to Defendant Seidl that he relied upon in seeking an arrest warrant.  To this end, Plaintiff cites Defendant Sonnenfeld's deposition during which he claims Defendant Sonnenfeld testified that he had "no evidence" that any money was actually stolen from the Business office, "no evidence" that Plaintiff stole money from the Athletic office, and that during his conversations with Defendant Seidl, Defendant

25

Sonnenfeld never learned of other evidence to support his allegations that Plaintiff stole money from his office. (Sonnenfeld Dep. Vol. II, at 40-41, 48-49, 54.) However, Plaintiff's conclusions are misleading, and in the proper context of that deposition the comments do not support an inference that Defendant Sonnenfeld knowingly made false statements to the police.

Defendant Sonnenfeld testified that he believed money was stolen from his safe because he discovered the key to his safe and money in the safe were both missing. (*Id*. at 44; ECF No. 46, Ex. 4, 11/2012, Sonnenfeld Emails.) Defendant Sonnenfeld also testified that he advised former-defendant Dahlin of his "reasonable belief" that Plaintiff stole the money from the Athletic office based upon viewing the video surveillance clip from November 20, 2012 which showed an unknown figure going into the Athletic office late at night, Plaintiff had a key to his office, Plaintiff had a similar body type to the unknown figure in video clip, Plaintiff was assigned to work in that hallway, Plaintiff was working the night the unknown figure went into the Athletic office, and money was also missing from the Business office which was in Plaintiff's assigned work area. (*Id*. at 29-30, 34-36.) Defendant Sonnenfeld testified that he informed former-defendant Dahlin and Defendant Seidl only of his belief that Plaintiff had stolen money from his office. (*See* Seidl Dep., 145-46, testifying that Defendant Sonnenfeld never stated he knew for a fact that Plaintiff committed the theft, and that Defendant Seidl was unaware of any Fitzgerald employees making false statements during the investigation; Sonnenfeld Dep., Vol. II, at 29, "I did not say this is – this is your guy.")

Defendant Candela never named Plaintiff as a potential culprit during his interview with police, in his written statement, or during his preliminary examination testimony. Thus, it is entirely unclear what statements Plaintiff believes Defendant Candela provided that were false.

26

Plaintiff appears to rely upon Defendant Candela's testimony that at the time he reported money missing from his petty cash box to the police, he had no "evidence that somebody stole that money." (Candela Dep. at 32-33, 40, 48-49.) Plaintiff's argument, however, is specious given the whole of Defendant Candela's testimony wherein he explained that he "reported the fact that money was missing from the safe. I don't believe I went beyond that at all."[8] (*Id*. at 39.)

In sum, Plaintiff failed to set forth any material factual evidence from which a trier of fact could conclude that Defendants Sonnenfeld or Candela made statements to the police that they knew to be false and were relied upon by the prosecutor. Thus, just as the Michigan Supreme Court reasoned in *Matthews*, where, as here, the police and/or prosecutor have initiated an independent investigation, a complaining witness is shielded from a malicious prosecution claim. In the present case, Defendants Sonnenfeld and Candela reported information to Defendant Seidl who conducted an independent investigation, the results of which he later turned over to a prosecutor, who then reviewed the information, and authorized an arrest warrant after finding probable cause to do so; Defendants Sonnenfeld and Candela did not initiate or continue the prosecution against Plaintiff. Accordingly, the Court will deny Plaintiff's request for summary judgment on this claim and grant Defendants' motion for summary judgment on this claim.

b.     False Arrest/False Imprisonment

Plaintiff alleged that Defendants Candela and Sonnenfeld participated or instigated the false or illegal arrest of Plaintiff and therefore are liable for his false arrest and/or imprisonment.

---

[8] Defendant Candela's answers regarding the fact he had "no evidence" of a theft were in response to the question "What evidence at the time did you have, <u>other than money missing from your safe</u>, that the safe was actually broken into and money was taken?" (Candela Dep. at 39 (emphasis added)).

(Compl. at ¶¶ 50-56.)  In Michigan, the elements of false imprisonment are: "an act committed with the intention of confining another, the act directly or indirectly results in such confinement, and the person confined is conscious of his confinement."  *Adams v. Nat'l Bank of Detroit*, 444 Mich. 329, 341 (1993).  "A false arrest is an illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant."  *Peterson Novelties, Inv. v. City of Berkley*, 259 Mich. App. 1, 17 (Mich. Ct. App. 2003).  "To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, *i.e.* the arrest was not based on probable cause."  *Id.* (citations omitted).

In Michigan, it is well settled that "[a] person is not subject to liability for false arrest where the person merely gives information to the police and the police use their own judgment in deciding whether to make an arrest."  *Adams*, 444 Mich. at 341 (citing *Lewis v. Farmer Jack Div., Inc.*, 415 Mich. 212, 219 n. 3 (1982)).  "It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them."  *Handlon v. Rite Aide Servs., LLC*, 513 F. App'x 523, 530 (6th Cir. 2013) (quoting *Lewis*, 415 Mich. at 219 n. 3).  There is an exception to this general rule such that a person who unreasonably "instigates the issuance of the warrant" is not protected from a claim of false arrest when the "officer acted on that person's judgment."  *Adams*, 444 Mich. at 341 n. 24 (citing *Raudabaugh v. Baley*, 133 Mich. App. 242, 248 (Mich. Ct. App. 1983)).

Plaintiff's argument that Defendants Candela and Sonnenfeld fall within the exception to the rule is unpersuasive.  In *Adams*, the case upon which Plaintiff relies, the defendant company

was sued after its employee erroneously gave the wrong name to the police when they called seeking information "in order to arrest the suspect..."  *Id*. at 340.  That person was then arrested and, although eventually declared innocent, committed suicide as a result of the stress and emotional upset of the arrest.  In *Adams*, the Michigan Supreme Court concluded that given the context of the employee's contact with the police, the defendant company, through its employee, could be "substantially certain that an arrest would follow from her disclosure."  *Id*.  The Michigan Supreme Court also found that the defendant company "did more than simply provide information to the police" because its internal security department "conducted the investigation leading to the arrest" and the police officer testified that he treated information from such a source differently than information gathered from an ordinary citizen.  *Id*. at 342-43.  Based on these facts, the Michigan Supreme Court concluded that the defendant company was not shielded by the fact that the arrest was made pursuant to a facially valid arrest warrant.  *Id*. at 343.

*Adams* is factually distinguishable from the present case.  Here, unlike *Adams*, here is no evidence from which a jury could reasonably conclude that Defendant Seidl did not use his independent judgment in making the decision to seek a warrant for arrest.  Indeed, while the police relied more heavily upon the information given by the security department in *Adams*, in the instant case, Defendant Seidl testified that he understood that Defendant Sonnenfeld was not "a hundred percent" certain that Plaintiff committed the crime and that Defendant Sonnenfeld had merely communicated his belief that Zavatson could be responsible.  (Seidl Dep. at 145-46.)

The school district conducted its own separate investigation.  It is clear that Defendant Seidl did not rely upon the school's investigation into the incident as Defendant Hagerty ultimately recommended that Plaintiff report back to work because the investigation was

29

"inconclusive" as to his involvement in the theft. (*Id.*) Further, the context in which Defendant Sonnenfeld expressed his perception that Plaintiff was the likely thief to Defendant Seidl and former-defendant Dahlin is also distinguishable from the situation in *Adam*s where an officer called seeking the name of a person "in order to arrest the suspect" and there was substantial certainty that an arrest would follow the identification. *Adams*, 444 Mich. at 340. Defendant Candela never mentioned Plaintiff's name to the police as suspect, and Defendant Sonnenfeld explained his involvement in the police investigation as merely turning over all the information he had to the police so they could perform an investigation. (Sonnenfeld Dep. Vol. II, at 54:16-17, stating "I handed everything over to the police for them to do their investigation. It was their investigation.")

The present facts are more analogous to those in *Lewis* where the Michigan Supreme Court found that a store employee could not be liable for false arrest when she "communicated facts and circumstances to the officer, [and] her perception that Lewis was the robber. The officer was left to act on his own judgment and evidently acted on his own judgment in arresting Lewis." *Lewis*, 415 Mich. at 219 n. 3. Similar to *Lewis*, in the present action there is nothing in the record to indicate that Defendant Sonnenfeld or Defendant Candela did anything more than relay information or suspicions to the police, who in turn conducted their own, separate investigation into the incident that then resulted in a prosecutor issuing an arrest warrant. Accordingly, the Court will deny Plaintiff's motion for summary judgment on the state false arrest claims and grant Defendants Sonnenfeld and Candela's motion for summary judgment on the same.

        c.      Intentional Infliction of Emotional Distress

Plaintiff also set forth a claim of Intentional Infliction of Emotional Distress against Defendants Sonnenfeld and Candela due to their involvement in his arrest.  To establish a prima facie case of intentional infliction of emotional distress under Michigan law, a plaintiff must present evidence of "(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, (4) the severe emotional distress of the plaintiff." *Walsh v. Taylor*, 263 Mich. App. 618, 632-33 (Mich. Ct. App. 2004) (citation omitted).  "Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id*. (citation omitted). A plaintiff "will only be able to recover for intentional infliction of emotional distress "in the most egregious of cases." *Watkins v. City of Southfield*, 221 F.3d 883, 890 (6th Cir. 2000) (citation omitted).

Plaintiff fails to evidence facts that Defendants Candela and Sonnenfeld's conduct was sufficiently outrageous in character.  In the *Adams* case, upon which Plaintiff relies in support for his false arrest and imprisonment claim against Defendants Sonnenfeld and Candela, the Michigan Supreme Court rejected the plaintiff's claim for intentional infliction of emotional distress, finding that a "mistake in identifying [the defendant] as the culprit was neither 'outrageous' nor done with bad purpose or intent, and, therefore, the Adams estate may not maintain an action for intentional infliction of emotional distress." *Adams*, 444 Mich. at 333 n. 4.  Similarly in this action, Plaintiff has not evidenced any malice or bad faith on the part of either Defendant Candela or Defendant Sonnenfeld.  Additionally, Plaintiff's allegations that

these Defendants made false statements is not supported by the record.  Therefore, the Court concludes Plaintiff has failed to evidence any "outrageous" behavior that could anchor a claim of intentional infliction of emotional distress against Defendants Candela or Sonnenfeld.

        d.      Abuse of Process

In Michigan, to establish a claim of abuse of process "a plaintiff must prove: '(1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceedings.'"  *Garcia v. Thorne*, 520 F. App'x 304, 311 (6th Cir. 2013) (quoting *Friedman v. Dozorc*, 412 Mich. 1, 29 (1981)).  "In other words, the plaintiff must show that the defendant used a proper legal procedure for a purpose collateral to its intended use, and there must be some corroborating act that demonstrates the ulterior purpose."  *Alman v. Reed*, 703 F.3d 887, 904 (6th Cir. 2013) (citation omitted).  The misconduct at issue "is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish."  *Garcia*, 520 F. App'x at 311 (citation omitted).  Indeed, "[a]n 'action for the abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue.'"  *Curran v. City of Dearborn*, 957 F. Supp. 2d 877, 887 (E.D. Mich. 2013) (quoting *Spear v. Pendill*, 164 Mich. 620, 623 (1911)).

In the present case, Plaintiff alleged that Defendants Candela and Sonnenfeld made false statements or deliberate omissions during the criminal proceedings of Plaintiff.  (Compl., at ¶¶ 90-91.)  Plaintiff, however, has failed to point to any evidence to support this allegation or identify any false statements or omissions made by Defendants Sonnenfeld and Candela.  Rather, Plaintiff relied upon his arguments regarding the state law claim of false arrest (*see* ECF No. 63,

Pl.'s Resp., at section III, subsection B) and his arguments regarding the Fitzgerald Defendants'
alleged violation of his Fourteenth Amendment right to due process (*Id*., at section III,
subsection E).  (*Id*., at 24.)  Subsection E of Plaintiff's response brief, however, does not
implicate the actions of Defendants Candela or Sonnenfeld and is therefore irrelevant to these
claims.  Plaintiff's reliance on subsection B of its response brief is similarly unhelpful because it
neither addresses how Defendants Sonnenfeld and Candela misused the legal process, nor
identifies false statements made by the Defendants during the investigation or their preliminary
examination testimony.  In sum, there is no evidence in this record that could support a finding
Defendants Candela and Sonnenfeld misused the legal process during the course of Plaintiff's
criminal prosecution.

Further, Plaintiff's cursory treatment of this claim constitutes waiver.  As the Sixth
Circuit recently noted in citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997):
[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived."  *Scott v. Reif*, No. 15-1859, --- F. App'x ---, 2016 WL
4578360, at *4 (6th Cir. Sept. 2, 2016).

Accordingly, the Court grants Defendants Candela and Sonnenfeld's motion for summary
judgment on this claim.

e.     Gross Negligence

Defendants Candela and Sonnenfeld seek dismissal of Plaintiff's claims of gross
negligence.  Plaintiff did not address these claims in his response brief or at the hearing.
Plaintiff also failed to identify with any particularity what conduct by Defendants Candela or
Sonnenfeld constituted gross negligence.

33

The Sixth Circuit has explained:

> the district court is not required to search the record to determine whether genuine issues of material fact exist where the nonmoving party has failed adequately to respond to a summary judgment motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir.1989). Rather, the trial court may rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir.1992). If the role of the trial court was not limited in this way, the trial court would be compelled to search all the materials submitted for genuine issues of material fact, develop legal theories and generally champion the position of the nonmoving party. *Id*. at 405-07.

*Young v. City of Cleveland*, 221 F.3d 1337, *2 (6th Cir. 2000) (Table); *see also Brown v. VHS of Mich., Inc*., 545 F. App'x 368, 372 (6th Cir. 2013) (holding that "[t]his Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." (collecting cases)).

Accordingly, Plaintiff's failure to address the gross negligence claims against Defendants Candela and Sonnenfeld constitutes waiver and the Court will dismiss these claims.

B.   Other Fitzgerald Defendants

Defendants Rainwater, Hagerty, VanSweden, Fitzgerald Public School Board of Education, and Fitzgerald Public Schools moved for summary judgment on Plaintiff's 42 U.S.C. § 1983 claim that they violated his procedural due process rights under the Fourteenth Amendment and the state law claims of abuse of process, gross negligence, and intentional infliction of emotional distress.

1.   Procedural Due Process Rights, 42 U.S.C. § 1983

As noted *supra*, to state a claim pursuant to 42 U.S.C. § 1983, the plaintiff "must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or the laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353,

358-59 (6th Cir. 2001) (citation omitted).  Section 1983, however, does not confer any substantive rights but rather affords a means to "vindicate rights conferred by the Constitution or laws of the United States."  *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010).  Here, Plaintiff claims the Fitzgerald Defendants violated his constitutional right to due process when he was suspended without pay and then terminated without just cause.  (Compl. ¶ 74.)  The Fitzgerald Defendants do not dispute that they were acting under the color of state law.

"Procedural due process protects those life, liberty, or property interests that fall within the Due Process Clause of the Fourteenth Amendment."  *Women's Med. Prof'l. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).  To establish a procedural due process claim, Plaintiff must show that "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest."  *Id*. (citation omitted).

In the present action, the Fitzgerald Defendants do not contest that Plaintiff had a protected property interest in his continued employment.  The Fitzgerald Defendants also do not contest that Plaintiff had a protected property interest in uninterrupted receipt of continued pay and benefits, *i.e.* an interest in not being suspended without pay.  Additionally, there is no dispute that Plaintiff was suspended without pay effective March 5, 2013 and was terminated on June 20, 2013.  Therefore, the only issue before the Court is whether Plaintiff was afforded all the process he was due.

"Due process requires some sort of pretermination hearing, the formality of which depends upon the importance of the interest and the nature of the subsequent proceedings."  *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004) (citing *Duchesne v. Williams*, 849 F.2d 1004,

1006-07 (6th Cir. 1988), *cert. denied*, 489 U.S. 1081 (1989)).  "Sufficient pretermination process 'need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story.'"  *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 620 (6th Cir. 2013) (quoting *Gilbert v. Homar*, 520 U.S. 924, 929 (1997)).  This procedure provides an "initial check against mistaken decisions."  *Id.* (quoting *Cleveland Board of Ed. v. Loudermill*, 470 U.S. 532, 545 (1985)).  "The essential elements required for due process are notice and an opportunity to respond, either in writing or in person."  *Farhat*, 370 F.3d at 595 (citation omitted).  "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee."  *Loudermill*, 470 U.S. at 546.

The Sixth Circuit has made clear that at the pretermination stage, an employee is not entitled to a neutral and impartial decisionmaker.  *Farhat*, 370 F.3d at 595 (citing *Duchesne*, 849 F.2d at 1006).  "Where there is a system of post-termination procedures available to the employee that includes a neutral decisionmaker and/or arbitration, coupled with a pretermination 'right of reply' hearing, then the employee has received all the process due under the Constitution."  *Id.* (collecting authority).

With this law in mind, the Court addresses each of Plaintiff's claims regarding his alleged denial of procedural due process.

a.      Defendant Rainwater

As an initial matter, Plaintiff specifically omits Defendant Rainwater from its response regarding his Due Process claim.  (ECF No. 63, Pl.'s Resp., at 21-22, addressing this claim only as to Defendants VanSweden, Hagerty, Fitzgerald Public Schools, and Fitzgerald Public School

Board of Education.)  Plaintiff also fails to identify any facts to support the allegations in his complaint that Defendant Rainwater suspended and terminated him without just cause.  (Compl., at ¶ 74.)  In fact, there is no evidence that Defendant Rainwater was involved in the decision to suspend Plaintiff without pay or involved in the decision to terminate his employment. (*See* VanSweden Dep., at 40, 51-52, testifying regarding her and Defendant Hagerty's involvement in the decision to termination and suspend Plaintiff.)  In light of Plaintiff's failure to respond to the motion for summary judgment in this regard, or cite to any evidence of Defendant Rainwater's involvement Plaintiff's suspensions or termination, the Court will grant summary judgment on this claim.  *See Young v. City of Cleveland*, 221 F.3d 1337, *2 (6th Cir. 2000) (Table) (holding "the district court is not required to search the record to determine whether genuine issues of material fact exist where the nonmoving party has failed adequately to respond to a summary judgment motion.")

      b.     March 5, 2013 Suspension without Pay

Plaintiff asserts that he was denied due process when he was suspended without pay on March 5, 2013.  Plaintiff states in his Response that he "was provided notice of the meeting and did have a union representative present.  However, the meeting itself was a sham as the decision to suspend Plaintiff without pay had already been decided."  (ECF No. 63, Pl.'s Resp. to Fitzgerald Mot., at 20.)  Plaintiff argues that the fact the letter informing Plaintiff of his suspension without pay was drafted before March 5, 2013 supports a finding that the decision to suspend him was also made prior to March 5, 2013 and thus, the meeting was nothing but a "sham."  *See Wagner v. City of Memphis*, 971 F. Supp. 308, 319 (1997) (recognizing that where the "outcome of a pretermination hearing has been predetermined regardless of the proof

presented, the concerns and goals of the termination hearing" have not been met and the hearing would not fulfill its function.)

The Court notes that Plaintiff conflates the March 5, 2013 meeting in which Plaintiff was suspended without pay and his later meeting with Defendant Hagerty regarding his grievance challenging that suspension. Indeed, Plaintiff attended a meeting in Defendant Rainwater's office on March 5, 2013 and was presented with a letter that informed him that he was suspended without pay pending an investigation upon the belief that Plaintiff had failed to comply with Michigan law and report his earlier felony arraignment. Shortly thereafter, Plaintiff filed a grievance regarding that unpaid suspension and later attended a meeting with his union representative and Defendant Hagerty regarding the same. After that second meeting, Defendant Hagerty denied Plaintiff's grievance based on the fact that neither Plaintiff nor his union representative had "provide[d] any evidence that Mr. Zavatson complied with State Law." (ECF No. 46, Ex. 18, May 24, 2013, Grievance Denial.)

With the record clarified, the Court finds Plaintiff's argument, that he was denied due process because he was deprived a real opportunity to challenge his suspension without pay, is without merit. After receiving the March 5, 2013 letter suspending him without pay, Plaintiff filed a grievance based on that suspension. Plaintiff also attended a meeting with his union representative and Defendant Hagerty regarding the suspension without pay and was allowed to present evidence to refute the charge against him. There is nothing in the record that indicates that Defendant Hagerty had predetermined the result of that second meeting. Rather, Defendant Hagerty denied Plaintiff's grievance regarding his suspension without pay because Plaintiff and his union representative did not present any evidence showing he had complied with State law.

(*See* ECF No. 46, Ex. 18, Grievance Denial.)  Plaintiff does not dispute that he violated State law by failing to report his felony arraignment as required.  Plaintiff also does not claim that he ever produced evidence to Defendants proving otherwise.  Accordingly, Plaintiff has not produced any evidence that Defendant Hagerty's denial of his grievance was a sham.

To the extent that Plaintiff is attempting to make an argument that Plaintiff was denied due process on March 5, 2013 when he was summarily suspended without pay effective immediately and without notice and a hearing, this argument has been rejected by the Supreme Court in the analogous case, *Gilbert v. Homar*, 520 U.S. 924 (1997).  In *Gilbert*, a university police officer asserted his due process rights had been violated when he was suspended without pay after he was charged with a felony drug possession.  520 U.S. at 926-27.  The university suspended the officer without pay "effective immediately."  *Id*. at 926.  The felony charges were later dismissed but the officer remained suspended without pay pending the university's investigation.  Ultimately, the officer was demoted and he received backpay.  *Id*. at 927.

The Supreme Court recognized in *Gilbert* that it "had not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination" and then went on to assume without deciding that it did.  *Id*. at 929.  The Supreme Court then rejected a categorical rule that would *always* require a hearing prior to the initial deprivation of property, i.e. a suspension without pay, and "emphasize[d] the flexibility of due process as contrasted" with a "sweeping and categorical rule" holding otherwise.  *Id*. at 931.  To determine what process is due, the Supreme Court held that a court must balance three factors: (1) the private interest that would be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used; and (3) the value (if any) or

39

additional or substitute procedural safeguards. *Id*. at 931-32 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). In weighing those factors, the Supreme Court compared a suspension with a final termination and noted that the employee's private interest in uninterrupted receipt of his paycheck is much less a concern in the context of a suspension versus a termination, especially when the employee received a "sufficiently prompt postsuspension hearing." *Id*. at 932. The Supreme Court also found the State had a significant interest in "immediately suspending" employees in positions of trust when they had been charged with a felony. Finally, the Supreme Court concluded there was little risk of error or need of additional safeguards because the officer had been charged with a felony and the charges themselves "serve to assure that the state employer's decision to suspend the employee [was] not 'baseless or unwarranted.'" *Id*. at 934. Ultimately, in denying the officer's due process claim, the Supreme Court acknowledged that a suspension without pay was different than a termination because "in the case of a suspension there will be ample opportunity to invoke discretion later – and a short delay actually benefits the employee by allowing state officials to obtain more accurate information about the arrest and charges." *Id*. at 934-35.

Similar to *Gilbert*, Plaintiff was suspended without pay from his position effective immediately and without an initial hearing. Yet, just as in *Gilbert*, Plaintiff was afforded a post-suspension hearing with a supervisor shortly after his suspension to challenge his suspension. Further, the Court notes that the Fitzgerald Defendants had a significant interest in "immediately suspending" employees who violated the State felony reporting law, and that the law itself provided for termination for non-compliance. The Court finds, in accordance with the Supreme Court's decision in *Gilbert*, that Plaintiff was afforded all the process he was due regarding his

40

suspension without pay when he was allowed to file a grievance challenging the suspension and afforded a post-suspension hearing with a supervisor regarding the same.

        c.      June 2013 Pretermination Hearings

Plaintiff also alleged that his procedural due process rights were violated based on the June 2013 pretermination hearings, not because he was denied notice or an opportunity to respond to the charges, but because the decision to terminate him was predetermined and "nothing he could have done or said would have made a difference."  (ECF No. 63, Pl.'s Resp. to Fitzgerald Defs.' Mot., at 21.)  Plaintiff's argument is based upon the following testimony from Defendant VanSweden:

> Q.     As of June 7, 2013, is it fair to say your mind was pretty made up that Mr. Zavatson committed a terminable offense?
>
> A.     Yes.

(ECF No. 55, Ex. G, VanSweden Dep. at 48:9-12.)

In support of his argument, Plaintiff relies upon two federal district court cases that held a pretermination hearing whose result was "predetermined" or was all but "meaningless" could offend a plaintiff's due process rights.  In *Wagner v. City of Memphis,* 971 F. Supp. 308 (W.D. Tenn., 1997), following a bench trial, the court concluded that a pretermination hearing was a "sham" when there was evidence that the mayor ordered the official presiding over the pretermination hearing to terminate the plaintiff regardless of what was produced or said at the pretermination hearing.  *Id.* at 317.  Similarly in *Bettio v. Villiage of Northfield*, 775 F. Supp. 1545, 1564 (N.D. Ohio 1991), the federal district court found a violation of due process when a pretermination hearing was presided over by officials that had knowingly brought false charges against the employee.

Unlike *Bettio*, however, in the present case, there is no similar evidence that "the charges which lead to the hearing are fabrications on the part of the defendant officials" (*i.e.* that Plaintiff had not been previously arraigned on felony charges or that Plaintiff actually complied with the state reporting law).[9]  Additionally, in *Wagner*, the single decisionmaker in the pretermination hearing was deprived of any discretion regarding the outcome of the hearing.  In the present case, despite the pretermination hearing being held before the entire Defendant Fitzgerald School Board, Plaintiff has only pointed to Defendant VanSweden as being biased.  This fact undermines Plaintiff's argument that the decision to terminate his employemnt was "predetermined."[10]  Further, while Defendant VanSweden testified that she believed prior to the pretermination hearing that Plaintiff had committed a "terminable offense," such testimony is in-line with Plaintiff's admission that he had failed to comply with the State reporting law that provided termination as a penalty for non-compliance.  *See* Mich. Comp. Laws § 380.1230d.

Here, at most, Plaintiff has alleged that Defendant VanSweden was biased against him. The Court notes, however, that "[t]he essential elements required for due process are notice and an opportunity to respond, either in writing or in person.  To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee " *Farhat*, 370 F.3d at 595 (citations omitted).  Critically,

---

[9] The Court is sensitive to the fact that Plaintiff was only arraigned on one felony charge that was later dismissed.  However, as noted *supra*, there is no evidence that these Fitzgerald Defendants were responsible for the criminal prosecution of Plaintiff.  Indeed, the school's investigation on the same thefts was inconclusive and Plaintiff was directed to resume his work in January 2013.

[10] In fact, the evidence of record contradicts the conclusion that the pretermination hearing was a forgone conclusion because Plaintiff was offered his position back, albeit without backpay and requiring a waiver not to sue.

"at the pretermination stage, the employee does not have a right to, and the Constitution does not require, a neutral and impartial decisionmaker." *Id*. Hence, Plaintiff was not entitled to a neutral and impartial decisionmaker at the pretermination stage. *Farhat*, 370 F.3d at 595 (citing *Duchesne*, 849 F.2d at 1006). Again, Defendant VanSweden was not the only decisionmaker at the pretermination hearing. The Defendant School Board voted on the issue after Defendant VanSweden recommended termination and upon the advice of counsel. (VanSweden Dep. at 51.)

Plaintiff also claimed that the sham status of his pretermination hearing was supported by the fact that the charge against him was not based on a "work rule" or his contract. Plaintiff, however, ignores the fact that he was charged with violating a state law that by its terms provided termination as a consequence of non-compliance. MICH. COMP. LAWS § 380.1230d. And significantly, Plaintiff also did not dispute that his employer notified him through email and a newsletter of this reporting requirement; Plaintiff just did not open or read the notifications. (*See* Zavatson's Dep. at 139, acknowledging that he was responsible for checking his email because information from his employer was relayed in that manner; ECF No. 59, Ex. 26, Email re: reporting requirement.) Finally, Plaintiff failed to explain the relevance or legal difference between a termination for violating a state law versus a termination for a "work rule." Again, it is undisputed that Plaintiff was notified of the charge against him prior to the June 13, 2013 hearing, he attended the hearing with counsel, and he did not dispute that he actually violated the state law. Plaintiff was also notified of the second hearing on June 20, 2013 and chose not to attend that hearing.

In summary, the Court finds that Plaintiff failed to evidence any genuine issue of material fact regarding whether his pretermination hearings held in June 2013 were nothing more than a sham.

      d.     Post-termination Proceedings

It is unclear from the Plaintiff's complaint if he is also claiming that his due process rights were violated based on the post-termination proceedings. Plaintiff's complaint did not make any specific allegation in this regard. In his response to the Fitzgerald Defendants' motion for summary judgment, however, Plaintiff appears to dispute that his post-termination proceedings were sufficient because Defendant VanSweden later denied Plaintiff's grievance and she was a biased decisionmaker.

To the extent Plaintiff is asserting a claim related to the post-termination proceedings, the Court finds it unsupported by evidence and unpersuasive. While neither Plaintiff nor the Fitzgerald Defendants supplied the Court with Plaintiff's contract (or collective bargaining agreement) or the pertinent grievance procedures, Plaintiff testified regarding the same. Plaintiff explained that he was entitled to post-termination proceedings under his contract. Specifically, after his termination, and after the Step III denial of his grievance by Defendant VanSweden, his union steward or representative had the option to forward evidence on to an attorney who would then, if the evidence supported such a decision, proceed to an arbitration hearing. (Zavatson's Dep. at 114-15.) Plaintiff testified that he did not believe his union steward forwarded anything to an attorney. (*Id*. at 115.) Plaintiff also testified that it was the union's duty to proceed to the next step and that it is "up to [the union] to turn it over to counsel." (*Id*. at 115.) Plaintiff's testimony is sufficient to show that there was a post-termination procedure available to Plaintiff

44

and it included an arbitration before a neutral decisionmaker.

> The law is well-established that it is the *opportunity* for a post-deprivation hearing before a neutral decisionmaker that is required for due process. As long as the procedural requirements are reasonable and give the employee notice and an opportunity to participate meaningfully, they are constitutionally adequate.

*Farhat*, 370 F.3d at 596 (citation omitted and emphasis in original).

From the record, the Court finds that the Defendants in this action could not have initiated the next step in the grievance process. Thus, the named Defendants did not violate Plaintiff's procedural due process rights by failing to provide or institute adequate post-termination procedures.

d.    Qualified Immunity

The Fitzgerald Defendants also assert that they are entitled to qualified immunity on Plaintiff's procedural due process claims because officials in their positions would have reasonably believed that Plaintiff was afforded due process under the circumstances. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v Creighton*, 483 U.S. 635, 639 (1987) (citation omitted). Here, the Court agrees that based on the case law set forth *supra*, including *Gilbert* and *Farhat*, that school officials in 2013 would have reasonably believed Plaintiff was afforded due process under these circumstances. Further, Plaintiff does not substantively address whether qualified immunity applies and fails to cite even the general legal standards on the issue. (ECF No. 63, Pl.'s Resp., at *22.) It is Plaintiff's burden to rebut the defense of qualified immunity once it is raised, and Plaintiff's failure to substantively address the issue is also a concession of this issue. *Roth v. Guzman*, 650

45

F.3d 603, 609 (6th Cir. 2007).

    2.       Abuse of Process, Intentional Infliction of Emotional Distress, and Gross Negligence

Defendants moved for summary judgment as to the claims of Abuse of Process, Intentional Infliction of Emotional Distress, and Gross Negligence as made against Defendants VanSweden, Hagerty, Rainwater, Fitzgerald Public School, or the Fitzgerald Public School Board.  Plaintiff does not rebut or address these claims in his response brief.  Indeed, Plaintiff's response brief explicitly addresses only Defendants Sonnenfeld and Candela in regards to the claims of Abuse of Process and Intentional Infliction of Emotional Distress, while the claim of Gross Negligence is not addressed as to any of the Fitzgerald Defendants.  Further, while Plaintiff's counsel declined to concede these claims at the hearing, Plaintiff also did not address or offer any argument regarding these claims during oral argument.  Again, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 996-97 (6th Cir. 1999) (citation omitted, alterations in *McPherson*), cited with additional approval in *Scott v. Reif*, *supra* at 33.  Accordingly, the Court concludes that Plaintiff waived these claims by failing to set forth any analysis or cite to any evidence in the record regarding these claims in the briefing or at the hearing.

## V. CONCLUSION

For all these reasons, the Court DENIES Plaintiff's motion for (partial) summary judgment as to Defendants Sonnenfeld and Candela (ECF No. 61); GRANTS Fitzgerald Defendants' Motion for Summary Judgment (ECF No. 46).  The Court will also DENY AS

MOOT Plaintiff's Motion for Certificate of Appealability relating to this Court's June 9, 2016

Opinion and Order (ECF No. 68).

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 23, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or
party of record herein by electronic means or first class U.S. mail on September 23, 2016.

s/Deborah Tofil
Case Manager

47