UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL ZAVATSON,

          Plaintiff,

v.

City of Warren Police Officer
DONALD SEIDL,

          Defendant.
_____/

Case No. 14-10623

Paul D. Borman
United States District Judge

David R. Grand
United States Magistrate Judge

**OPINION AND ORDER:**
**(1) GRANTING IN PART AND DENYING IN PART DEFENDANT**
**SEIDL'S MOTION *IN LIMINE*; AND**
**(2) GRANTING PLAINTIFF ZAVATSON'S MOTION *IN LIMINE***

## I. BACKGROUND

In 2013, Plaintiff Daniel Zavatson was charged with two felony larceny counts after cash went missing from two safes in the Warren, Michigan high school where Zavatson was employed by Fitzgerald Public Schools as a custodian. The high school initiated its own investigation into the incident, as did the Warren Police Department. Zavatson was fired from his job at the high school for failing to report his arraignment on the felony charges, as Michigan law required him to do. Zavatson was bound over at the state district court preliminary examination on one of the criminal charges. Subsequently, that criminal charge was dismissed at the state circuit court. Thereafter, Plaintiff Zavatson filed a complaint in this Court.

Plaintiff Daniel Zavatson's Complaint, filed on February 10, 2014, asserted false arrest, malicious prosecution, failure-to-train, failure-to-supervise, and procedural-due-process claims against a total of nine Defendants. (ECF No. 1, Compl.) Among the Defendants were the City of Warren, Michigan; Warren police officer Donald Seidl; Zavatson's employer Fitzgerald Public Schools ("**FPS**"); the Fitzgerald Public School Board of Education; and five individual Defendants affiliated with FPS and/or its Board of Education.

This Court granted summary judgment to all Defendants on all claims. (ECF Nos. 66, 74.) The Sixth Circuit affirmed this Court's grant of summary judgment as to all Defendants except for Zavatson's federal and state false arrest claims against Defendant Donald Seidl, the Warren police officer who investigated the claims and submitted the application for Zavatson's arrest warrant to the Macomb County prosecutor. *See generally Zavatson v. City of Warren, Michigan*, 714 F. App'x 512 (6th Cir. 2017) (available on the docket at ECF No. 80). This case is now proceeding to trial on those two remaining false arrest counts. As discussed *infra*, those counts encompass the two-day period between the execution of the warrant and Zavatson's arraignment.

Each party has filed one Motion *in Limine*. Defendant Seidl seeks to limit Plaintiff Zavatson's available damages to the two-day period between the issuance of the arrest warrant on January 22, 2013, and his arraignment in court on that

2

warrant on January 24, 2013. The Motion seeks to preclude Zavatson from introducing evidence of any post-arraignment events at the liability phase of trial: in particular, subsequent lost wages and diminished earning capacity.

Zavatson requests that Seidl be barred from introducing evidence of certain events that substantially predate the time period relevant to this case: Zavatson's 2000 bankruptcy, a back injury he suffered in 2003 or 2004 and the related worker's compensation claim, and his wife's 2002 personal-injury lawsuit.

This Court conducted a hearing on the Motions *in Limine* on July 17, 2018.

## II.   LEGAL STANDARDS

The federal procedural and evidentiary rules that govern proceedings before this Court, as well as the cases interpreting those rules, "all encourage, and in some cases require, parties and the court to utilize extensive pretrial procedures – including motions *in limine* – in order to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999); *see also Louzon v. Ford Motor Co.*, 718 F.3d 556, 560 (6th Cir. 2013) ("A motion in limine is any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." (internal quotation marks omitted)).

"Motions *in limine* typically involve matters which ought to be excluded from the jury's consideration due to some possibility of prejudice or as a result of previous

3

rulings by the Court." *Provident Life & Acc. Ins. Co. v. Adie*, 176 F.R.D. 246, 250 (E.D. Mich. 1997). District courts have broad discretion over matters involving the admissibility of evidence at trial. *See United States v. Seago*, 930 F.2d 482, 494 (6th Cir. 1991). "[*I*]*n limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) (citing *Luce v. United States*, 469 U.S. 38, 41-42 (1984)).

### III.  DISCUSSION

**A.  Seidl's Motion *in Limine***

Defendant Seidl makes two distinct arguments in his Motion *in Limine*. First, he contends that should Plaintiff Zavatson prevail as to his liability for false arrest, his damages should be strictly limited to emotional-distress damages that arose directly during that two-day period in January of 2014. Second, he contends that the Court should bar evidence of any events that occurred after the arraignment.

**1.  Limitation of damages**

The following facts are undisputed: Seidl submitted the request for Zavatson's arrest warrant to the Macomb County Prosecuting Attorney's office on January 18, 2013; assistant Macomb County prosecutor Heather Odgers authorized the warrant on January 22, 2013; Zavatson was advised to turn himself in to the Warren Police Department on January 24, 2013; Zavatson was arraigned at the Warren district court the same day he turned himself in, and released on a $50,000 personal bond.

Seidl argues in his Motion *in Limine* that should Zavatson prevail on his false arrest claims, his damages must be narrowly circumscribed from the period of his arrest to his release: from the date his arrest warrant was issued (January 22, 2013) to his arraignment and release (January 24, 2013). Seidl cites several court decisions addressing federal false arrest claims, which held that events occurring after the plaintiff's arraignment are properly within the scope of a malicious prosecution claim, rather than a false arrest claim. Seidl contends that because the Sixth Circuit upheld this Court's dismissal of Zavatson's state and federal malicious prosecution claims, Zavatson's damages for false arrest must be "limited to one or two days of emotional distress attributable to the arrest alone." (Def.'s Mot. at 12, Pg ID 5847.)

In his Response, Zavatson counters that a tort claimant, whether suing under 42 U.S.C. § 1983 or on some other legal basis, is entitled to recover compensatory damages for all injuries suffered as a consequence of the defendant's actionable conduct. He also cites decisions that stand for the proposition that "[a] plaintiff who proves that police arrested him without probable cause is entitled to compensation for the economic and non-economic damages he incurs as a proximate result of these violations." (Pl.'s Resp. at 11, Pg ID 5919 (alteration in original) (internal quotation marks omitted) (quoting *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991)).) Accordingly, Zavatson argues, he is entitled to compensation for lost wages arising from his difficulties in obtaining employment as a result of his arrest. In that regard,

Zavatson has submitted a report by his retained expert witness accountant Michael Pivoz, which calculates that Zavatson's net lost lifetime earnings, fringe benefits, and pension benefits total $2,678,000, with a "Discounted Amount" of $1,046,000. (Pl.'s Resp. Ex. D, Pivoz Report.)

In his Reply, Seidl points out that it is undisputed that Zavatson was terminated by FPS not because of his arrest but because he failed to report his felony arraignment to FPS as he was required to do by Michigan law. Seidl also argues that insofar as Zavatson's lost-wage damages are due to his discharge by FPS, Seidl himself cannot be liable for those damages, since he was not involved in the FPS decision to terminate Zavatson, and any of the original FPS Defendants who might have been involved in the decision were found by the Sixth Circuit not to have violated Zavatson's constitutional rights.

Seidl's argument relies chiefly on the Supreme Court decision *Wallace v. Kato*, 549 U.S. 384 (2007). In *Wallace*, the Supreme Court addressed the issue of when the statute of limitations for a § 1983 false arrest or false imprisonment claim begins to run, which itself turned on the issue of "when the alleged false imprisonment ends." *Wallace*, 549 U.S. at 389 (internal quotation marks omitted). On this point, the Supreme Court explained:

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is

> bound over by a magistrate or arraigned on charges. Thereafter, unlawful detention forms part of the damages for the "entirely distinct" tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process. "If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself."

*Id.* at 389-90 (emphasis in original) (footnote omitted) (citations omitted) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts* § 11, p. 54, § 119, pp. 885–886, 888 (5th ed. 1984)). As it is relevant to this case, *Wallace* thus stands for the proposition that, in a § 1983 false arrest action as well as at common law, "damages for detention after issuance of process or arraignment would be attributable to a tort other than . . . unlawful arrest." *Id.* at 391.

Zavatson, on the other hand, supports his argument by citing the recent Sixth Circuit decision *Wesley v. Campbell*, 864 F.3d 433 (6th Cir. 2017). In *Wesley*, the Sixth Circuit addressed (and upheld) a jury verdict in favor of a former elementary school counselor who had been falsely arrested for child sexual abuse. Among the issues that the Sixth Circuit confronted in *Wesley* was the jury's award of compensatory damages to the plaintiff, which included damages for "lost wages, past pain and suffering, and future pain and suffering." *Id.* at 445. On appeal, the defendant-appellant in *Wesley* challenged only the $132,000 awarded in lost-wages damages. Particularly relevant to the instant case, the defendant made two causation

arguments against that award: that the plaintiff's arrest had occurred after he had been fired from his job, and that his job was slated to be eliminated anyway due to lack of funding. Each of these facts, the defendant-appellant argued, should have destroyed any causal connection between the plaintiff's arrest and his claimed lost wages. The Sixth Circuit rejected both arguments, and quoted with approval the district court's rationale for denying the defendant-appellant's motion to remit the jury's award of compensatory damages:

> Despite the fact that Wesley's arrest occurred after his termination, the arrest for sexual abuse remained on his record until fall 2010. During this time, as the testimony of [the former superintendent of Wesley's school system] demonstrated, it is extremely unlikely that any school would have interviewed him for a job. Additionally, Jackson testified that, because of the gap in his resume caused by the arrest, Wesley would have had several hurdles to overcome in getting an interview. The red flags caused by his false arrest, and the resulting unemployment period, were detrimental to Wesley's ability to be rehired in any position, but especially in one working with children. Further, even if Wesley was terminated from his position due to budgetary restrictions, which, given the circumstances, the jury would have been reasonable in considering suspect, Defendant's arrest still caused him sufficient harm to justify the jury's award.

*Id.* at 445-46 (quoting *Wesley v. Rigney*, No. CV 10-51-DLB-JGW, 2016 WL 853505, at *12 (E.D. Ky. Mar. 3, 2016)). *Wesley* thus makes clear that a plaintiff's damages, including lost wages, that are a "direct result of his unlawful arrest" can be recovered in a false arrest action under § 1983, even if the harm itself is actually suffered after the issuance of process or the plaintiff's arraignment. *Id.* at 446.

8

The decisions on which Seidl and Zavatson place their primary reliance—*Wallace* and *Wesley*, respectively—are not in fact inconsistent with each other, and are both consistent with established precedent regarding compensatory damages in constitutional tort actions generally. Two principles emerge from that body of precedent. The first is that in a § 1983 action, "'compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering.' . . . Where any harm is shown, . . . damages proportionate to that harm should be awarded." *Chatman v. Slagle*, 107 F.3d 380, 385 (6th Cir. 1997) (quoting *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)).

The second principle serves as a limitation on the first: "Proximate causation is an essential element of a § 1983 claim for damages. That is, a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury." *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 442 F.3d 410, 443 (6th Cir. 2006) (internal quotation marks omitted) (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994)), *rev'd on other grounds*, 551 U.S. 291 (2007). Moreover, when it comes to "reputational damage, foreseeability is an element of the proximate cause analysis, but it is distinct from the requirement that a plaintiff show the injury was directly caused by the defendant." *Brentwood Academy*, 442 F.3d at 443-44 (citing *Perry v.*

*Am. Tobacco Co.*, 324 F.3d 845, 850–51 (6th Cir. 2003)). Thus, "[i]t is a fundamental tort law principle that while an injury to a plaintiff might be foreseeable, the damages incurred could still be 'too remote to permit recovery.'" *Id.* at 444 (quoting *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 236 (2d Cir. 1999)). *See also Estate of Sowards v. City of Trenton*, 125 F. App'x 31, 41 (6th Cir. 2005) ("[P]roximate causation is an essential element of a § 1983 claim for damages.") (internal quotation marks omitted) (collecting cases).

The effect of these principles on the instant case is that while Zavatson is not necessarily barred as a matter of law from recovering damages for harms suffered after his January 24, 2013 arraignment (as Seidl argues he is), Zavatson nevertheless may only recover damages for injuries that were both (1) a "direct result of his unlawful arrest," *Wesley*, 864 F.3d at 446, and (2) not "too remote to permit recovery," *Brentwood Academy*, 442 F.3d at 444.

The Court finds that Zavatson's claim of lost wages does not satisfy this standard. First, the causal relationship between Zavatson's arrest and his lost wages—and therefore the extent to which the latter was a "direct result" of the former—is undermined by the lack of evidence that the termination of Zavatson's employment with FPS was directly caused by his arrest. Indeed, the Sixth Circuit explicitly found in its October 31, 2017 opinion in this matter that Zavatson was suspended from his job because he failed to report his felony arraignment to FPS as

required by Michigan law.[1] The Sixth Circuit also pointed out that while his union grievance was pending, Zavatson refused an offer of reinstatement by FPS that was conditioned on his agreement not to sue FPS. *See Zavatson*, 714 F. App'x at 517-18. The parties do not dispute these facts.

Zavatson testified both as to his failure to report his arraignment and as to his later rejection of the reinstatement offer in a February 12, 2015 deposition. (Def.'s Reply Ex. A, Deposition of Daniel Zavatson at 75:23-77:12, 83:10-20.) These facts materially distinguish this case from *Wesley*. In *Wesley*, the plaintiff had been discharged before his arrest, and the court found based on credible evidence that an arrest for sexual abuse on his record then made it "extremely unlikely that any school would have interviewed him for a job" in his subsequent search for new employment. *Wesley*, 864 F.3d at 446 (6th Cir. 2017) (citation omitted). Here, by contrast, Zavatson's initial suspension for failing to report his felony arraignment to FPS and his rejection of the reinstatement offer represent superseding causes of his ultimate termination from FPS, which is what necessitated his subsequent

---

[1] Mich. Comp. Laws § 380.1230d provides in relevant part that "[i]f a person who is employed in any capacity by a school district, intermediate school district, public school academy, or nonpublic school . . . is charged with a crime listed in section 1535a(1) or 1539b(1)3 . . . , the person shall report to the department and to the school district, intermediate school district, public school academy, or nonpublic school that he or she has been charged with the crime." Mich. Comp. Laws § 380.1230d(1). The list of crimes covered by this statute includes "[a]ny felony." Mich. Comp. Laws §§ 380.1535a(1)(a), 380.1539b(1)(a).

employment search in the first place. His discharge from FPS was not a direct result of his arrest, and his subsequent lost wages therefore could not have been either.

Moreover, to whatever extent Zavatson's lost wages were caused *indirectly* by his arrest—i.e., as the initial occurrence that set the subsequent events in motion—the superseding causes of Zavatson's termination discussed above attenuate any connection between the arrest and Zavatson's lost wages in a way that makes the lost wages "too remote to permit recovery" via a false arrest claim against Seidl. *Brentwood Academy*, 442 F.3d at 444. This is not only because those superseding causes account for Zavatson's need to search for new employment to begin with, but also because they create alternative inferences as to the reason that search was unsuccessful. In other words, a separate reason that Zavatson's lost wages are "too remote [from his arrest] to permit recovery," *id.*, is that his difficulty obtaining new employment was because of his termination from FPS, which was not directly caused by his arrest.

Zavatson must therefore make at least some showing that he lost employment opportunities because of the arrest and not just the termination, and he has failed to do this. He argues that at least one potential employer did not hire him as a result of his arrest, and cites a series of emails between two individuals apparently responsible for hiring custodians for Litchfield Elementary School District ("**LESD**"), a school district located in Arizona, where Zavatson now lives. (Pl.'s Resp. Ex. B, Emails.)

In that series of emails, an LESD human resources professional wrote to an LESD maintenance director after Zavatson had been interviewed, noting that another employee mentioned to her that "the candidate may have shared with you he was accused of stealing before he left his employer. . . . I'm concerned as a night custodian, he would have this in his background." (*Id.*) The maintenance director responded that "the applicant mentioned it in his interview and that he had been exonerated." (*Id.*) The human resources professional replied: "was it a school investigation or was he actually arrested by the police? Is there anymore [*sic*] detail that he shared with you?" (*Id.*) There is no response to this question.

Although this evidence suggests LESD's awareness of (and concern regarding) Zavatson's arrest, it does not impel the conclusion that LESD did not ultimately hire Zavatson because of an arrest. Indeed, any such conclusion is undermined by Zavatson's deposition testimony that the reason LESD gave him for its decision not to hire him was "lack of reference." (Zavatson Dep. 34:21-25.) He further testified that with respect to one of the three FPS references he provided to LESD—his direct supervisor and the only one of his references employed at the particular school where he had worked—he was told it had taken "like 25 phone calls to finally get ahold of somebody," and that even then, he did not know whether the reference had ever responded to LESD, and he had only ever seen a blank form by way of a response from her. (Zavatson Dep. 33:7-34:20.) Zavatson's testimony

13

included the following significant admission:

> Q. Were you provided with any other reason as to why you were not awarded the position at Litchfield Elementary School?
>
> A. Just lack of reference from my employer.
>
> Q. Anything else?
>
> A. That's it.

(Zavatson Dep. 35:17-22.)

Zavatson's proffered evidence does not demonstrate that he was not hired by LESD because of his arrest, and he has not otherwise shown that he incurred lost wages as a direct result of his arrest. The lost-wages evidence will therefore be excluded, because the Court finds, based on Zavatson's testimony, that these damages were not a direct result of Zavatson's arrest, and/or too remote from that arrest to permit recovery.[2] With respect to this evidence of lost wages, Seidl's

---

[2] The parties' arguments in their briefing on Seidl's Motion *in Limine* are grounded almost exclusively in federal law, and neither party has cited authority suggesting that the result should be any different as to Zavatson's parallel state-law false arrest claim. Indeed, Michigan law, like federal law, contemplates a requisite causal relationship between an unlawful arrest and a plaintiff's injuries in awarding damages for such claims. *Compare Stowers v. Ardmore Acres Hosp.*, 19 Mich. App. 115, 126 (1969) (upholding a jury's award of damages to a false imprisonment claimant where "[s]ufficient proof of various unauthorized actions resulting in grievous damages to the plaintiff by the defendant exists to support the substantial award against him"), *aff'd sub nom. Stowers v. Wolodzko*, 386 Mich. 119 (1971) *with Moore v. City of Detroit*, 252 Mich. App. 384, 388 (2002) (holding that a plaintiff could not maintain a false-imprisonment claim after finding that "[t]he confinements allegedly caused by [the defendant's] conduct were momentary and fleeting," while "Plaintiff's escape was stalled at length only when, through his own recklessness, he

Motion is granted.

### 2. Evidence of post-arraignment events

Seidl also argues that Zavatson "should be precluded from offering evidence of events which occurred after his arraignment on January 24, 2013[,] as such evidence is irrelevant to Plaintiff's false arrest claims." (Def.'s Mot. at 2, Pg ID 5830.) This evidence includes "the preliminary examination hearing, the dismissal of charges against Plaintiff, Detective Seidl's taking of fingerprints, Plaintiff's polygraph examination and results, and Plaintiff's March 5, 2013 suspension, grievance proceedings, and eventual termination." (*Id.* at 13, Pg ID 5848.) Seidl contends that since the central element of both of Zavatson's false arrest claims is whether Seidl had probable cause to effect Zavatson's arrest, and because "[t]he probable cause determination depends on the reasonable conclusions 'drawn from the facts known to the arresting officer at the time of the arrest,'" it follows that any evidence of events that took place after Zavatson's arrest is *per se* irrelevant. (Def.'s Reply at 5, Pg ID 5985 (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).) The Court disagrees.

Seidl's argument overlooks that the Sixth Circuit opinion discussed evidence relating to events subsequent to Zavatson's arraignment in determining that Seidl

---

injured himself"). The Court thus finds that the foregoing analysis applies to Zavatson's state-law false arrest claim as well as his federal claim.

was not entitled to summary judgment on the false arrest claims. Specifically, the Sixth Circuit examined "basic investigatory steps" that Seidl took after the arrest warrant was issued and Zavatson was arraigned, as well as post-arraignment testimony by both Seidl and Odgers, and held that a reasonable jury could conclude based on that evidence that Seidl made false statements in his warrant application, intentionally omitted material facts from that application, or acted in bad faith, such that Seidl was not entitled to summary judgment on qualified immunity or governmental immunity grounds. *Zavatson*, 714 F. App'x at 521-23.

Thus, the decision to be made by the trier of the fact in this case will not be limited to the issue of whether Seidl had probable cause (though that is an essential element of Zavatson's claims). Rather, the factfinder will also have to consider whether Seidl may invoke qualified immunity as to Zavatson's federal claim and governmental immunity as to his state-law claim, and in making these determinations, the factfinder should not be precluded from considering certain limited post-arraignment events. For example, Zavatson can question Seidl:

> 1. About whether he secured the safes from which cash was stolen;
> 2. About whether he took fingerprints off the safes before he went to the prosecutor to see if they would match Zavatson's;
> 3. About whether he investigated not just custodians, but other individuals who had a master key that provided access to the offices in which the safes were located;
> 4. About whether he reviewed the video with the prosecutor;

5. About whether he told the prosecutor that he could not identify the person in the video; or

6. About Seidl's testimony at the preliminary examination.

On the other hand, Zavatson cannot question Seidl:

1. About any polygraph examination; or

2. About fingerprint analysis results.

Seidl has requested a broad prohibition on admission of all evidence relating to events after Zavatson's arraignment under Federal Rule of Evidence 401. The Court's present ruling applies to the admissibility of this evidence to prove liability, and does not necessarily extend to the issue of damages. Further, the Court is not ruling as to other Federal Rules of Evidence. Insofar as Seidl's Motion *in Limine* seeks this broad prohibition, the Motion is denied.

**B.      Zavatson's Motion *in Limine***

Zavatson seeks to have the following evidence excluded at trial:

a. Any and all evidence relating to Plaintiff's declaration of bankruptcy in or about the year 2000.

b. Any and all evidence relating to Plaintiff's worker's compensation claim for a back injury in or about 2003 or 2004, including the injury and the receipt of benefits.

c. Any and all evidence relating to [Zavatson's wife] Jennifer Zavatson's lawsuit related to an injury in or about the year 2002.

(Pl.'s Mot. at 2, Pg ID 5884.)

Each of these categories of evidence, Zavatson argues, would be both irrelevant under Federal Rules of Evidence 401 and 402, and substantially more

17

prejudicial than probative under Federal Rule of Evidence 403. Specifically, Zavatson argues that evidence regarding his bankruptcy would be patently irrelevant to his false arrest claims because "[t]here is simply no connection between [those claims and] a bankruptcy that occurred more than 10 years prior to the subject incident," and also because Zavatson "was not experiencing financial difficulty at the time of his arrest." (Pl.'s Mot. at 4, Pg ID 5894.) Zavatson also notes in particular that if Seidl's intention is to introduce evidence of Zavatson's financial hardship to suggest that he had a motive for theft, this is prejudicial in itself. Similarly, Zavatson argues that his earlier back injury that prompted him to file worker's compensation claims, as well as his wife's personal injury lawsuit, are both significantly remote in time from the incidents relevant to this action, would not make any material fact more or less probable, and could result in jury confusion.

In his Response, Seidl maintains that he has no intention of introducing any of the contested evidence for the purpose of suggesting a motivation to commit theft. Instead, Seidl argues that if Zavatson is permitted to introduce evidence of lost earnings and lost earning capacity, the evidence that Zavatson seeks to exclude may be relevant. In particular,

> [t]he fact that Plaintiff suffered a back injury in 2003 or 2004, and filed for bankruptcy in 2000, may be relevant to the jury's determination of whether, and to what extent, Plaintiff incurred lost earnings and a loss in earning capacity. Further, to the extent that Plaintiff will attempt to argue that his intimate relationship with his wife has been adversely

18

impacted as a result of his arrest, the nature and extent of Jennifer Zavatson's injury, and the resulting impact, if any, on their intimate relationship, would be a relevant consideration for the jury.

(Def.'s Resp. at 6, Pg ID 5978.)

In his Reply, Zavatson accurately points out that Seidl has offered no specific explanation as to how evidence of Zavatson's bankruptcy, his back injury and resulting worker's compensation claim, or his wife's personal injury lawsuit could be relevant to his damages in this action. Zavatson also argues that evidence suggesting financial hardship would "subject [him] to unfair prejudice with no probative value as it would only be offered by Defendant as an attempt to convince the jury that Plaintiff somehow had financial problems and that is what motivated him to file the instant lawsuit"—an assumption which "could not be further from the truth." (Pl.'s Reply at 3, Pg ID 6068.)

As discussed *supra*, this Court finds that Zavatson has failed to show that his lost wages or diminished earning capacity were direct results of his arrest, or that they were not too remote from the arrest to permit recovery. This finding largely moots Seidl's argument for introduction of the evidence challenged by Zavatson in his Motion *in Limine*, since that argument is based primarily on the assumption that Zavatson will introduce lost-wages evidence. To the extent that it is not, the Court finds that Zavatson's bankruptcy, Zavatson's back injury and resulting worker's compensation claim, and Jennifer Zavatson's personal injury lawsuit are

19

significantly remote in time from the events relevant to this lawsuit. Indeed, it is not clear how the challenged evidence is at all relevant to Zavatson's claims or Seidl's defenses, and Seidl's argument for its relevance is perfunctory. Accordingly, Zavatson's Motion *in Limine* is granted.

### IV. CONCLUSION

For the reasons stated above, the Court hereby ORDERS that:

- Defendant Seidl's Motion *in Limine* is GRANTED to the extent that it seeks to exclude evidence of post-arraignment damage claims not directly caused by acts or omissions of Defendant Seidl, including (but not limited to) the lost-wages claims that Zavatson has submitted in his Response to Seidl's Motion *in Limine*;
- Defendant Seidl's Motion *in Limine* is DENIED in all other respects; and
- Defendant Zavatson's Motion *in Limine* is GRANTED.

IT IS SO ORDERED.

Dated: August 8, 2018

s/Paul D. Borman
Paul D. Borman
United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 8, 2018.

s/D. Tofil
Deborah Tofil, Case Manager